* Note from the reporter of decisions: The opinion was released by the Supreme Court under the date September 17, 2004. This case was actually released to the public on September 20, 2004.
On November 8, 1999, George Babakitis, as administrator adcolligendum of the estate of Joseph T. Robino, Jr., deceased, filed a complaint seeking declaratory relief, asking the trial court (1) to set aside a foreclosure sale on property known as the Lorna Village Shopping Center ("Lorna Village") that was jointly owned by Joseph T. Robino, Jr. ("Joseph Jr."), and his brother, S.T. Robino ("S.T."); (2) to determine the amount of mortgage indebtedness on Lorna Village; and (3) to determine the amount of attorney fees and expenses Beal Bank, SSB ("Beal"), the mortgagee, was entitled to for conducting the foreclosure sale.
On February 18, 2000, Babakitis assigned to Frank S. Schilleci the estate's statutory right of redemption to Lorna Village, as well as all rights in any pending litigation. Schilleci petitioned the trial court to substitute him as the real party in interest in the declaratory-judgment action, and the trial court granted the petition insofar as it allowed him to enforce his property rights in the pending case. On March 6, 2000, Schilleci amended the complaint to ask that "the attorney fees be declared excessive, that the foreclosure sale be kept in place, and the Court declare and determine the amount that [he] can pay [Beal] in order to redeem . . . Lorna Village Shopping Center"; he later filed a verified amended complaint. Thereafter, Schilleci redeemed the property from Beal. After various other motions, the case proceeded to a bench trial on the issue of the reasonableness of the attorney fees. The trial court, in an order dated December 19, 2002, stated, in pertinent part: *Page 397 
 "This case was originally filed in January, 1998,[1] and has been a prime example of extended and often unnecessary litigation. Originally the parties were George Babakitis, in his representative capacity for Joseph Thomas Robino, Jr. (`Joe Robino'), both before and after Joe Robino's death. Some property owned by Joe Robino and his brother, S.T. Robino, was the subject of foreclosure by the mortgage holder, Beal Bank (`Beal'). Beal purchased the property at foreclosure for $480,000.00. Attorneys for Beal stated that the principal balance and accrued interest due was $338,811.00. Beal's attorney also claimed attorney fees and expenses of $153,616.59 less a credit of $17,500.00 for a balance of $136,116.59. Babakitis appeared before the Honorable Jack Carl to seek permission to sell the statutory right of redemption to Frank S. Schilleci, Jr. (`Schilleci') for $75,000.00. Judge Carl approved and Schilleci requested this Court to substitute him as the real party in interest pursuant to Rule 17(a)[, Ala.R.Civ.P.] Schilleci's motion was granted only to the extent of enforcing his property right in this case. Schilleci is now before this Court disputing the amount of attorney fees and expenses claimed by Beal's attorney. Schilleci has paid into Court $572,875.79 to redeem subject property and has asked the Court to determine what is a reasonable attorney's fee for the services of Beal's attorney.
 "Schilleci has described the attorney fees claimed by Beal to be `unreasonable, inequitable and unconscionable.' Beal has cited the extended time and effort that was needed to protect Beal's interest. They cited time in Circuit Court, in the Court of Civil Appeals and in Bankruptcy Court. There is no doubt that an inordinate amount of time and effort had to be spent by all parties due to the litigious acts and conduct, primarily by S.T. Robino, who at one time was held in contempt by this Court and sentenced for such contempt.
 "Both Schilleci and Beal presented evidence of their claims as to the reasonableness of the fees and expenses claimed by Beal. Schilleci presented several attorneys who testified as to reasonable attorney fees for Beal's attorneys. Jerry O. Lorant, Esquire, testified that a reasonable attorney's fee for Beal would be $35,000.00 to $40,000.00 and at the outside, $55,000.00. His opinions were that Beal's claims were far too high and that much of Beal's attorney's time was due to the attorney's physical location in Atlanta, Georgia. Sam Maples, Esquire, testified that he had approximately the same activity in the case and had one hundred ninety (190) hours of billed time at the $150.00 per hour or total fees of $28,500.00. He stated that Beal's legal services should not have exceeded his. Charles Cleveland, Esquire, testified that there was duplication of effort by Beal's attorney and that a reasonable fee for Beal was $5,000.00. Alan Summers, Esquire, testified that far too many lawyers and too many billing hours were claimed by Beal's attorneys; and that Beal's claims were unreasonable. His opinion was that $26,500.00 to $28,000.00 was a reasonable fee for the foreclosure. Frank C. Galloway, III, Esquire, testified that he had handled thirty o[r] forty foreclosures, some of which were commercial. His opinion was that $3,000.00 plus advertising and recording was reasonable; and that Beal's claims were unreasonable. Chalice Tucker, Esquire, testified *Page 398 
that she had completed approximately sixteen thousand foreclosures and that about forty percent (40%) of them required filing pleadings related to a Chapter 7, 11 or 3 Bankruptcy. She stated that a reasonable fee in this case would be $1,250.00 or a maximum of ten percent (10%) of the mortgage debt or no more than $33,000.00.
 "In response, Beal presented evidence of the reasonableness of their claims. Among the submissions presented by Beal were concerns with what they characterized as S.T. Robino's wrongful acts, his failure to surrender possession of subject property, repeated interferences with the property manager appointed by the Court, his constant filing of unjustified pleadings and appeals, and his various instances of subterfuge. Beal claimed that all of the fees were reasonable and necessary under the circumstances. It is not contested that Beal's attorneys were entitled to reasonable compensation under the provisions of the mortgage. Schilleci contested that the amount of fees is reasonable or necessary. Beal discounted the testimony of Schilleci's witnesses proffered as experts. Among Beal's claims were that Schilleci's witnesses' experiences were limited or limited to typical residential mortgage foreclosures. Some of such witnesses either did not review any or all of Beal's invoices, or their pleadings in this case. Beal presented Dan Sparks, Esquire's testimony as to the fees claimed by Beal. Mr. Sparks had extensive experience in handling commercial foreclosures and bankruptcies. Mr. Sparks studied and considered the invoices presented by Beal's attorneys, Burr 
Forman, and concluded that the claims for attorney fees were reasonable and necessary. Mr. Sparks testified that frequently the lender's attorney had to react to claims by the debtor. Beal's attorneys also argued that the legal fees claimed were discounted on several occasions to account for travel time for Beal's attorney from Atlanta.
 "The question presented to the Court is `are the legal fees charged by Beal's attorneys of $153,616.50 less $17,500.00 (previously paid by a surety company on a reversal of an injunction) for a total of $136,116.59 to foreclose the mortgage on subject property reasonable and necessary.' The mortgage foreclosure sale was for $480,000.00. Principal, interest and other accrued charges due under the mortgage were $351,479.00. The balance of the credit of $128,521.00 was applied to accrued legal fees and expenses; and reimbursed from the proceeds of the foreclosure sale. Schilleci argues that the claimed fee to debt ratio is evidence of the unreasonableness of the attorneys' fees. He also contends and presents citations that ten percent (10%) of the balance due should be the maximum attorneys fees for any foreclosure. Ten percent (10%) of $480,000.00 is $48,000.00 and of $351,479.00 is $35,147.90. Each reduced by the prior credit of $17,500.00 would be $30,500.00 and $17,647.00 respectively. Beal's attorneys state that such [a] formula is too simplistic and does not reflect the time, effort and resources actually required in this case. There is no doubt that the activities of S.T. Robino substantially and unnecessarily contributed to the costs in this case.
 "Upon the submissions of the parties the Court finds that a reasonable fee for services performed by Beal's attorneys in this case to be $80,000.00 less $17,500.00 previously paid, or $62,500.00. This is not to preclude any claim Beal may have against S.T. Robino for his acts. Either party may submit a proposed order consistent with the Court's findings." *Page 399 
The trial court subsequently entered a judgment, on January 24, 2003, against Beal, which stated, in pertinent part:
 "A judgment is hereby entered in this cause in favor of Frank S. Schilleci, Jr., and against Beal Bank in the amount of Seventy-three Thousand Six Hundred Sixteen and 59/100 Dollars ($73,616.59), which said sum is arrived at by subtracting Eighty Thousand and No/100 Dollars ($80,000.00), the amount of a reasonable attorney's fee, from the sum claimed by Beal Bank in the amount of One Hundred Fifty-three Thousand Six Hundred Sixteen and 59/100 ($153,616.59)."
On January 30, 2003, Beal filed a motion to alter, amend, or vacate the judgment. On March 7, 2003, the trial court entered an order granting in part and denying in part Beal's motion; that order stated, in pertinent part:
 "1. The Court, having issued its Judgment on January 23, 2003 awarding a judgment in the amount of $73,616.59 in favor of Frank S. Schilleci, Jr., and against Beal Bank, SSB, it is the opinion of the Court that this Judgment amount shall remain without modification or changes. That is to say that the Court's opinion concerning the reasonableness of attorney fees previously addressed by the Court in its Order of December 19, 2002 remains without modification or change.
 "2. The Court alters, amends and modifies its Judgment of January 23, 2003 by ordering the judgment amount of $73,616.59 to be paid into the Jefferson County Circuit Clerk's office by Beal Bank, SSB and directs the Clerk to deposit said sum into an interest bearing account. This court will then conduct a hearing in order to make a determination as to whether there are any other claims or claimants that exist, other than Frank S. Schilleci, Jr., who are entitled to these funds. . . .
 "3. In all other respects, this Court's order of December 19, 2002 and Judgment of January 23, 2003 remain in full force and effect without any modification."
On May 6, 2003, the trial court entered an order vacating the March 7, 2003, order. The new order stated, in pertinent part:
 "1. On March 7, 2003, the Court entered an Order granting and denying in part the Motion to . . . Alter, Amend, or Vacate Judgment Filed on Behalf of Beal Bank, SSB (`the Order').
 "2. On March 21, 2003, a hearing was held to determine whether there are any other claims or claimants that exist, other than Frank S. Schilleci, Jr., who are entitled to the funds to be disbursed by Beal (the `Hearing').
 "3. In open court at the Hearing, a discussion occurred regarding the amount of funds that Beal should pay into the Jefferson County Circuit Clerk's office. The prior amount that this Court arrived at, $73,616.59, resulted from subtracting the reasonable legal fees as determined by this Court, $80,000.00, from the amount incurred by Beal, $153,616.59. This is the amount set forth in the March 7, 2003 Order. However, the correct amount that Beal should disburse to the Jefferson County Circuit Clerk's office is actually $66,021.00. This amount equals the amount of money actually paid to Beal, $146,021.00, minus what this Court determined a reasonable amount of legal fees should be, $80,000.00. The amount of money actually paid to Beal, $146,021.00, represents $128,521.00 applied from the foreclosure sale and proceeds from a cost bond in the amount of $17,500.00. *Page 400 
 "4. Therefore, the amount of money Beal should disburse into the Jefferson County Circuit Clerk's office, $66,021.00, is the amount of money that was actually paid to Beal minus the amount determined by this Court for reasonable legal fees.
 "5. All other aspects of the March 7, 2003 Order remain in full force and affect."
(Emphasis original.)
On appeal, Beal raises one issue:
 "Whether the Trial Court abused its discretion in holding, without setting forth what factors it contemplated in determining that Beal Bank's attorneys' fees should be reduced to $80,000.00 when the only credible evidence given by any expert who had reviewed the invoices and various pleadings involving the work done by Beal Bank's attorneys asserted that the correct amount was $146,021.00?"
 I. Standard of Review
This Court has stated that "`[t]he determination of whether an attorney fee is reasonable is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion.' Ex parte Edwards, 601 So.2d 82, 85 (Ala. 1992), citing Varner v. Century Fin. Co., 738 F.2d 1143 (11th Cir. 1984)." State Bd. of Educ. v. Waldrop, 840 So.2d 893, 896
(Ala. 2002).
 II. Facts
On May 30, 1986, Lorna Village Partners ("LVP") obtained a loan from Guaranty Federal Savings and Loan ("Guaranty Federal") in the principal amount of $400,000. The loan was secured by a first-mortgage lien on Lorna Village, which is located in Birmingham, as well as by liens on other properties. Ultimately, through procedures not necessary to recount, Beal became the holder of the note and mortgage. The mortgage included the following provision:
 "23. COSTS OF COLLECTION: Mortgagor will pay all reasonable attorney's fees and expenses which may be incurred by Mortgagee in enforcing the terms of the Note and this Mortgage, or in any suit to which the Mortgagee may become a party where the Mortgage or [Lorna Village] are in any manner involved and all expenses incurred in presenting a claim against the estate of a decedent or a bankrupt and will also pay any attorney's fees and expenses reasonably incurred in connection with the assignment to Mortgagee of any leases subsequently entered into by Mortgagor which are required to be assigned to Mortgagee as additional collateral to secure payment of the indebtedness herein secured as well as any and all such fees and expenses reasonably incurred prior to full and final payment of such indebtedness relating to future advances, transfer or title to the premises and similar matters not otherwise provided for herein. In addition to the foregoing, Mortgagor hereby reaffirms those provisions of the Note pertaining to attorneys' fees and costs incurred by Mortgagee as a result of a default in the payment of the Note."
(Emphasis added.)
In 1995, LVP assigned its rights, title, and interest in Lorna Village to the estate of Joseph T. Robino, which, in turn assigned the same to Joseph Jr. and S.T.
The legal proceedings that preceded the award of attorney fees at issue here are, in pertinent part, as follows. On January 27, 1998, Babakitis, as conservator for Joseph Jr., sued S.T. and his wife, Shirley, alleging that they collected rents on the properties owned jointly by S.T. and Joseph Jr., including Lorna Village, and never provided Joseph Jr. his share of the rental income. *Page 401 
On January 28, 1998, the trial court issued an order, temporarily restraining S.T. and Shirley from collecting rents on the properties and appointing Southpace Properties, Inc., to manage the various properties.
At some point, Beal instituted foreclosure proceedings on Lorna Village and filed a complaint, as well as an emergency motion, in the United States District Court for the Northern District of Alabama, seeking to have a receiver appointed for Lorna Village because, it claimed, S.T. and Joseph Jr. had defaulted in their obligation to Beal by failing to pay the principal and interest installments on the note secured by the mortgage on Lorna Village as they came due. On February 17, 1998, Beal moved to intervene as a plaintiff in Babakitis's action, alleging that it held a note that was in default and that the note was secured by a mortgage on certain properties, including Lorna Village, and asking the court to hold in an escrow account all rents and proceeds generated by Lorna Village; the motion was granted.
On February 27, 1998, Babakitis, in his capacity as conservator, filed a complaint for declaratory relief seeking "a determination by [the circuit court] of the validity of the right of Beal to institute foreclosure proceedings and conduct a foreclosure sale" on Lorna Village; he also filed an emergency motion for injunctive relief and a supporting brief, asking the court to enjoin Beal's foreclosure of Lorna Village. Beal filed an answer to the motion for declaratory relief. On March 11, 1998, the trial court issued an order temporarily enjoining Beal from foreclosing on the property "provided [Babakitis] post a surety bond or a cash bond in the amount of $25,000.00 with the Court" and appointed Southpace Properties, Inc., as receiver to "take charge of the daily operations and to manage the property and to collect the rents, income and revenue. . . ." On March 12, 1998, Babakitis amended the emergency motion for injunctive relief and the complaint for declaratory relief.
On March 13, 1998, the trial court entered a preliminary injunction, restraining S.T. and Shirley from collecting rents on the properties jointly owned by S.T. and Joseph Jr., as well as ordering S.T. to comply with other provisions. On March 20, 1998, Beal filed a motion asking the court to reconsider its March 11 order, which enjoined Beal from foreclosing on Lorna Village. On March 24, 1998, Beal filed an amendment and a revision to its motion to reconsider; Babakitis filed a response. On March 25, 1998, Beal appealed the March 11 order to this Court, and we transferred that appeal to the Court of Civil Appeals. The Court of Civil Appeals ordered that the injunction be dissolved. BealBank, S.S.B. v. Babakitis, 723 So.2d 687 (Ala.Civ.App. 1998).
On March 25, 1998, Babakitis filed a verified application for the entry of a default judgment against S.T. and Shirley. On March 30, 1998, Western Surety Company issued an injunction bond to Babakitis. On April 1, 1998, S.T. and Shirley answered the complaint filed on January 27, 1998, and both filed motions to dismiss that complaint as well as Beal's application for intervention. On April 6, 1998, Beal filed an answer to Babakitis's complaint for declaratory relief. On April 13, 1998, Babakitis and Beal filed a joint motion asking S.T. and Shirley to show cause as to why they did not comply with the court's March 13, 1998, order. The court ordered S.T. and Shirley to show cause, and that same day, it also denied Beal's motion to reconsider.
Joseph Jr. died on April 20, 1998. On May 13, 1998, Beal filed a motion to correct the record on appeal to the Court of Civil Appeals, which the trial court granted. Thereafter, Babakitis filed two motions *Page 402 
to correct the record on appeal, which were both granted.
On June 3, 1998, Beal filed its own motion to show cause as to why S.T. and Shirley did not comply with the trial court's March 13, 1998, order. Shirley filed a response to Babakitis's and Beal's motions to show cause on June 5, 1998. On June 10, 1998, Shirley filed a motion for a summary judgment. On June 11, 1998, after a hearing, the trial court entered an order that stated that it had found that Shirley was "in compliance with the Court's order" but that S.T. had failed to comply with the court's order, and it therefore held S.T. in contempt of court.
On July 8, 1998, Beal filed a motion asking the trial court to direct Southpace Properties to provide insurance on Lorna Village, which the trial court granted. On September 18, 1998, Babakitis, as personal representative of the estate of Joseph Jr., filed a motion to substitute himself, as administrator adcolligendum, as the plaintiff in these actions.
On September 22, 1998, the trial court amended its June 11, 1998, order holding S.T. in contempt to state that it found that "S.T. Robino has engaged in contumacious conduct in direct disobedience to the Court's order of June 11, 1998." The amended order also directed that S.T. be taken "into custody" and held "pending his compliance with the orders of this Court of March 13, 1998; and any further orders of this Court." On October 6, 1998, S.T. filed with this Court a notice of appeal from the trial court's June 11 and September 22 orders, which this Court transferred to the Court of Civil Appeals pursuant to Ala. Code 1975, § 12-2-7(6).
On October 13, 1998, Beal filed a motion to dissolve the March 11, 1998, temporary injunction preventing Beal from foreclosing on Lorna Village; the trial court denied the motion. On October 26, 1998, Beal filed a motion to compel and a motion for sanctions against Babakitis for his failure to respond to written discovery. On October 23, 1998, the Court of Civil Appeals reversed the judgment in Beal's appeal of the preliminary injunction and remanded the case to the trial court. Beal Bank,S.S.B. v. Babakitis, supra. The injunction was subsequently lifted.
On November 13, 1998, S.T. was placed in the Jefferson County jail on the trial court's order holding him in contempt. On November 17, 1998, he filed a petition for bankruptcy in the United States Bankruptcy Court for the Northern District of Alabama. That same day, the trial court ordered that "[S.T.] be released from the Sheriff's custody where he is being held for civil contempt pending further orders of the Bankruptcy Court." Subsequently, the Bankruptcy Court dismissed the adversary proceeding.
On December 10, 1998, Beal filed a motion to enforce the surety bond. That motion was supported by the affidavit of Gary W. Farris, who attested that the "total of the attorneys' fees and costs incurred in connection with the injunction amounts to $52,291.50." Thereafter, Beal filed a motion for a hearing on the motion to enforce the surety bond. The trial court set the hearing on that motion for January 27, 1999. On that date, the parties announced a settlement agreement in open court. On February 10, 1999, the trial court ordered Babakitis and Western Surety Company, which had issued the surety bond, to pay Beal $17,500. That same day, Babakitis moved for a protective order and to quash the taking of his deposition. On February 24, 1999, Beal filed an opposition to Babakitis's motion and it also filed a motion to enforce the settlement agreement, or, alternatively, a motion for a new hearing on the motion to enforce the surety bond. *Page 403 
Babakitis responded to Beal's motion to enforce the surety bond on March 12, 1999. On March 30, 1999, the trial court granted Babakitis's motion for a protective order and to quash the deposition. On October 1, 1999, the Bankruptcy Court dismissed S.T.'s adversary proceedings. On October 29, 1999, Beal foreclosed on Lorna Village.
 III. Attorney Fees
This case provides an example of how a simple procedure — the foreclosure of property under a power of sale — can evolve into a litigious ordeal. The trial court's December 19, 2002, order accurately describes the situation: "[t]his case . . . has been a prime example of extended and often unnecessary litigation." Beal contends the trial court erred in reducing the amount of attorney fees from the amount claimed, $146,021, to $80,000, and asks this Court to reverse its order doing so. In Peebles v. Miley,439 So.2d 137 (Ala. 1983), the Court adopted five additional criteria to the seven already existing that a court may consider when making a determination regarding the reasonableness of an attorney fee. Those 12 criteria are:
 "(1) the nature and value of the subject matter of the employment; (2) the learning, skill, and labor requisite to its proper discharge; (3) the time consumed; (4) the professional experience and reputation of the attorney; (5) the weight of his responsibilities; (6) the measure of success achieved; (7) the reasonable expenses incurred; (8) whether a fee is fixed or contingent; (9) the nature and length of a professional relationship; (10) the fee customarily charged in the locality for similar legal services; (11) the likelihood that a particular employment may preclude other employment; and (12) the time limitations imposed by the client or by the circumstances."
Van Schaack v. AmSouth Bank, N.A., 530 So.2d 740, 749 (Ala. 1988).
We stress that these criteria are evaluative and not an exhaustive list of specific criteria that all must be met when reviewing the reasonableness of an attorney fee. This Court stated as much in Graddick v. First Farmers Merchants NationalBank of Troy, 453 So.2d 1305, 1311 (Ala. 1984):
 "We do not suggest that all of these criteria must be met. Indeed, there would hardly ever be a case where the application of attorney's fees brought into play every criterion. But they are available for the trial court to consider in connection with each claim for an award of attorney fees."
Our caselaw otherwise has developed the following body of principles pertinent to our review in this case:
 "In the matter of fixing attorney's fees, wherein the evidence consists of the opinions of competent witnesses expressive of their judgment as to the value of the services, the register may call to his aid his own judgment of their value, and fix the fee accordingly. This latter rule extends to the trial judge, and on to this court on appeal."
Dent v. Foy, 214 Ala. 243, 249, 107 So. 210, 216 (1925).
 "The guiding rule in the fixation of attorney's fees is that the trial court, in connection with a consideration of the opinion evidence proffered by qualified experts, may call to his aid his own estimate of the value of such services and the amount of the allowance rests within the sound judicial discretion. Dent v. Foy, 214 Ala. 243, 107 So. 210
[(1925)].
 "And though, in reviewing the propriety of the fixation of such fees by the lower court, this court will be guided by its own judgment upon a consideration *Page 404 
of the whole record, Frazer v. First National Bank of Mobile, 235 Ala. 252, 178 So. 441, 126 A.L.R. 1 [(1938)]; Dent v. Foy, supra, we make such review with a presumption in favor of the ruling of the court below and will not set aside its decree unless we are convinced that that court abused the discretion wisely vested in it."
King v. Keith, 257 Ala. 463, 470, 60 So.2d 47, 52 (1952).
 "The trial court, in connection with a consideration of the opinion evidence proffered by qualified experts, may call to his aid his own estimate of the value of such legal services after considering the aforementioned elements and, generally speaking, the allowance rests within the sound judicial discretion of the trial court. Dent v. Foy, 214 Ala. 243, 107 So. 210 [(1925)].
 "However, this court has the right, as did the trial court, to look to the whole record on the question of the value of attorneys' services, and may treat opinions of witnesses as advisory and may render such decree fixing attorneys' fees as it deems right and proper under all the circumstances. King v. Keith, [257 Ala. 463, 60 So.2d 47 (1952)]; Frazer v. First Nat. Bank of Mobile, [235 Ala. 252, 178 So. 441
(1938)]. But we make such review with the presumption in favor of the ruling of the court below and will not set aside its decree unless we are convinced that that court abused the discretion wisely vested in it. King v. Keith, supra."
Ingalls v. Hare, 266 Ala. 221, 228, 96 So.2d 266, 274 (1957).
However, while we have recognized that "the reasonableness of an award of attorney fees is within the discretion of the trial court, subject to correction only for an abuse of discretion," we have noted that when an appellate court reviews the award of an attorney fee "we must be able to discern from the record whatfactors the trial court considered in determining the amount of attorney fees." Lanier v. Moore-Handley, Inc., 575 So.2d 83, 85
(Ala. 1991), citing Van Schaack v. AmSouth Bank, N.A., supra (emphasis added).
 "We now turn to the question regarding the amount of attorney fees awarded. `The determination of whether an attorney fee is reasonable is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion.' Ex parte Edwards, 601 So.2d 82, 85
(Ala. 1992). Our deference to the trial court in attorney-fee cases is based upon our recognition that the trial court, which has presided over the entire litigation, has a superior understanding of the factual questions that must be resolved in fee determinations. See Hensley v. Eckerhart, 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Nevertheless, the trial court's order regarding an attorney fee must allow for meaningful review by articulating the decisions made, the reasons supporting those decisions, and the performance of the attorney-fee calculation. American Civil Liberties Union of Ga. v. Barnes, 168 F.3d 423, 427 (11th Cir. 1999); see also Hensley, 461 U.S. at 437, 103 S.Ct. 1933."
City of Birmingham v. Horn, 810 So.2d 667, 681-82 (Ala. 2001). See also Lolley v. Citizens Bank, 494 So.2d 19 (Ala. 1986);Huntley v. Regions Bank, 807 So.2d 512 (Ala. 2001); Ex parteEdwards, 591 So.2d 491, 493 (Ala. 1990) ("The trial court reduced the requested fee of $75,301.56 to $9,000.00. In doing so, the trial court made no findings of record as to why such a reduction was made. We are not in a position to determine if in fact the trial court abused its discretion in awarding a lesser fee than was requested without first knowing the court's reason for doing so."). *Page 405 
In Horn, supra, this Court took upon itself the task of independently assessing the reasonableness of certain blocks of billed attorney time specifically challenged as containing duplicative or unnecessary hours, and we modified the award based upon our determination from the record. However, unlike Horn, nothing in the case before us directs our attention to any discrete amounts of time alleged to be either excessive or redundant and certainly none that, in the aggregate, could account for the extreme elimination of hours the trial judge obviously undertook. Schilleci's attorneys simply make the argument that the total attorney fee claimed was unreasonable. The most the six witnesses called by Schilleci's counsel testified to is reflected by the following excerpts from their testimony:
 "Q [counsel for Schilleci]: Do you have an opinion as to the fair and reasonable attorney's fee for what was done in this particular case, foreclosing the mortgage, the bankruptcy proceeding, and the [appeal to the] Supreme Court . . .?
"A [witness one]: Yes, sir, I believe I do.
 "Q: Would you tell His Honor what, in your opinion, is a fair and reasonable fee for that work?
 "A: . . . I think that the payment of the fee, if I would have sat down and gone through what I believe happened without digging down into the trenches, but reading it all as it evolved, should be $35 to $40,000, which is roughly 10 percent of the amount of the properties, plus I think that $17,500 would add it up to $50, $55,000 at the outside for a reasonable fee for the efforts contemplated and within the parameters, I think, of the question that you propounded to me.
". . . .
 "Q: Why do you consider that fee of $147,000 [sic] unreasonable?
 "A: It's a whole heck of a lot of money, and, of course, the lawyers deal with a whole heck of a lot of money all the time, but it was a foreclosure of a piece of property. There was nothing contingent about it. There was nothing that would be complex that a firm like [the law firm] couldn't cut right through with what I perceive to be the astuteness that they know how to cut through, straw defenses and straw allegations and just really tilting [at] windmills. I think if they had sat back and rendered a bill in the amount of $50,000 for the whole litigation that you discussed, it would have been fine, and maybe some extenuating. But that extenuating, I don't see, would be much more that [sic] $5 or $6,000. I was involved very recently in a piece of property involving $1.3 million in the state on [Highway] 280, and it was contentious. It was not a foreclosure, and I represented an out-of-state purchaser. It was an ongoing matter and it also involved litigation. I ended up charging, but then I ain't all that smart about charging, I don't think, but I ended up charging $5,000 for having resolved it, based upon the time I put in it."
This witness acknowledged that he did not know the hourly rate charged by the lawyers in the law firm representing Beal.
The second witness for Schilleci was not called as an expert witness, but, rather, was called because he was involved in the bankruptcy and foreclosure proceedings that were a part of the overall litigation.
 "Q [counsel for Schilleci]: What was the total fee that you received for all the work you did in connection with this foreclosure, including bankruptcy, including the appeal? "A [witness two]: Roughly about $30,000. . . .
". . . .
 "Q: How much time was involved in the bankruptcy proceedings? *Page 406 
 "A: Of that $28,000, $29,000, I would say — I would say probably — I want to say $8,000 worth of time, maybe nine. You know, that's just off the top of my head."
The testimony of Schilleci's third witness came closer to alleging that redundancy exists in some of the hours billed by Beal, but was far too limited to be significant to the entire award, because he testified about only one facet of the total work done by Beal's attorneys:
 "Q [counsel for Schilleci]: How many lawyers were involved in all [the bankruptcy work]?
 "A [witness three]: At one time or another, seven or eight — six or seven. I'm not sure of the number, but there were several.
"Q: Could that have been done by one or two lawyers?
 "A: One lawyer could have handled everything. If he was sick or something, with one substitute. Everything I saw with bankruptcy court could have probably been better handled by one lawyer than several.
". . . .
 "Q: All right. Do you have an opinion as to what a reasonable fee would be to process the foreclosure, based on the information I have submitted to you? "A: I have an opinion as to what a reasonable fee would be for the services rendered in the bankruptcy court.
"Q: And what is that?
 "A: In my opinion, a fair and reasonable fee for the services that were rendered by [the law firm] would be around $5,000."
During cross-examination, that witness testified:
 "Q [counsel for Beal]: Did you find any particular entries to be unreasonable work that was being performed?
"A: Yes.
"Q: Okay. Which were those?
 "A: Well, there were — every time there was an appearance, like I said, already there was duplication in the preparation of documents in the bankruptcy court. There were appearances of two lawyers in the bankruptcy court at almost every hearing I saw. And all of those, one would have been adequate. It was nothing that would require two lawyers. In addition to that, there were numerous entries of hours showing something like management of file or review of file, and that appeared to me to be large amounts of totally unnecessary work.
 "Q: Have you tried to come up with a dollar figure for those entries that you think are unreasonable?
"A: No, I have not.
". . . .
 "Q: You do not think that [the law firm's] rates are unreasonable. Is that correct?
 "A: No . . . I charge $150 [per hour], but I don't think the rates — those rates that were charged were excessive, the hourly rate."
When the fourth witness was asked if he had an opinion as to what would have been a fair and reasonable attorney fee, and, if so, what that opinion was, he responded:
 "A: Yes, sir, I do have an opinion. My opinion would be that it would be somewhere around $26,500 to $28,500, I thought was reasonable."
However, on cross-examination, he testified that it was reasonable for the law firm to charge between $200-$250 an hour for court appearances, and $185-$200 for time spent outside court. It was simply his position that the law firm claimed to have spent too many hours on the matter.
 "A [witness four]: I don't really know what the average hours that [were] charged. It was the number of hours, *Page 407 
and a number of different parties working on it.
 "Q [counsel for Beal]: Well, can you give me any specific example of any time sheet entry that you believe was an unreasonable act taken on behalf of somebody who worked for [the law firm]?
 "A: Well, I thought the charges, and I can't remember exactly, like to go over to a motion hearing, which we have to go and do routinely, and there's not that much to it, simply filing a motion, an affidavit and getting a hearing and running over there an[d] hearing it, and I thought the charges on those that you have submitted, I thought those were high.
"Q: Well, specifically, which one?
 "A: Well, if you'll pull any of them out, you can-you have the sheet. You can look and see what you charged.
 "Q: Well, actually, I thought that was what you were here to testify about.
 "A: No, I'm not here to testify [as to] what you charged. I'm just saying what you charged, specifically is what you asked me, was excessive.
". . . .
 "Q: Well, what factors did you use in determining that the fees were unreasonable?
 "A: All right, let's start at the top. First of all, I don't think it was necessary to have a lawyer from Atlanta, Georgia, when you have a whole office filled with them right here in Birmingham, and the properties are here and the forms are here. That's first.
". . . .
 "A: The next one is, I think there's too much time assigned like billing hours for motions to go over there. You and I both know that most of this work is generated by clerical staffs, and it's all in the computer, and to just go over to a hearing and you call it litigation, and that's not really litigation. It's going over for a little motion hearing, filing an affidavit, hearing it, and you're gone."
The testimony of the fifth witness regarding a reasonable attorney fee was also applicable only to a portion of the proceedings:
 "A: . . . My opinion is that I am qualified to give an opinion as to the appropriateness of fees on the foreclosure. I do not feel that I have sufficient — that is the power of sale foreclosure. That I don't have sufficient qualifications or knowledge of the intricacies of the proceedings going up and down to the appellate courts and to the bankruptcy [court] to give an opinion on that. I do — as I told [counsel for Beal] earlier today when the three of us met with [another attorney], that it is my opinion that a reasonable fee, as contemplated by the adjective `reasonable,' which is used twice by the mortgage, it would be $3,000 for doing the foreclosure work. And that is exclusive of whatever the advertising, the incidental advertising cost would be and the recording fee. But in terms of the lawyer fee, it is my opinion that a $3,000 fee would be appropriate for that."
However, once counsel for Beal posed a hypothetical that mirrored substantially what activities and litigation had taken place during the efforts to accomplish the foreclosure, the witness admitted that he would not accept that body of work for an attorney fee of only $3,000. Later in his testimony, although admitting that from everything he had seen the law firm did the work reflected in the bills he had reviewed, he expressed the view that not all of the work done in connection with the foreclosure was necessary:
 "A: I don't think it was necessary for [the law firm attorney] to spend over an hour to check the title when it was being ordered. . . . And there is a charge for *Page 408 
1.3 hours for walking from the [law firm] to the bankruptcy court to get a copy [of] an order, which I thought was unnecessary. There is 8.7 hours for an Atlanta attorney to drive from Atlanta to Birmingham to walk to the Jefferson County Courthouse on the 21st Avenue side and conduct a foreclosure sale, which I think is unnecessary in that [the law firm] is a wonderfully skilled firm, and they surely have lawyers, such as [names an attorney], who can go from its office three blocks away and do that in a much more economical rate than having somebody drive from Atlanta to conduct a sale."
The last witness presented by Schilleci testified that the most she ever charged for a foreclosure was $1,250, which is also the amount that she would have charged to do the foreclosure in this case. However, she alternately testified that the maximum attorney fee that could reasonably be charged for the foreclosure should be 10% of the unpaid principal, which would be $33,000.
In Ex parte Edwards, 601 So.2d 82 (Ala. 1992), this Court stated: "When an applicant for attorney fees `has carried his burden of showing that the claimed rate and number of hours are reasonable, the resulting product is presumed to be the reasonable fee to which counsel is entitled.'" 601 So.2d at 85, quoting Blum v. Stenson, 465 U.S. 886, 888, 104 S.Ct. 1541,79 L.Ed.2d 891 (1984). See also Horn, supra (applicants for an attorney fee bear the burden of proving their entitlement to an award and documenting their appropriately expended hours).
Although Beal presented only one expert witness, that witness provided the court with extensive testimony regarding the reasonableness of the attorney fee sought, beginning his testimony with a recitation of what he had reviewed in order to render his opinion:
 "A: Actually, quite a lot, and quite more than anyone else who testified for the plaintiff so far. I have reviewed every single line of every single time sheet that has been submitted to me, and what I have worked off of is Exhibit 8 of the interrogatories, which are the time sheets. I have reviewed every single line. I have reviewed the redacted version, meaning the blacked-out version where the attorney/client information was redacted, and I have reviewed the un-redacted information separately, so I know what was un-redacted. I have reviewed not just every page, but I have reviewed every single line and every single time entry and the corresponding time and dollar allocations. I have reviewed every single pleading, I think, that I could get my hands on. [The law firm] brought me three or four boxes. I went to them and got them, actually, and went through them for several hours over a couple of days. They initially delivered to me, [counsel for Beal] did, a Federal Express package that I looked at which includes select correspondence. I reviewed every research file, I've looked at all the cases they've pulled, I've reviewed drafts of memos, drafts of pleadings, drafts of briefs. I did not read every brief. I looked through them. I reviewed Mr. Schilleci's deposition and some other depositions in the case, though I did not read all of the deposition[s] that was [sic] put in evidence here. I did read every word of Mr. Schilleci's deposition. I read the part of the file that I thought necessary to form an opinion, and candidly, the other people who have testified here have not read what I read. I have also read select correspondence out of the file, and I saw large correspondence files, but it was suggested to me that I not review the actual correspondence between the bank and the client, because *Page 409 
the bank did not have the time to look at those files to determine — excuse me, the lawyers didn't — what might be in there from an attorney/client standpoint.
"Q [counsel for Beal]: Privileged?
 "A: Privilege standpoint. But I did have access to everything else, and it was hundreds and hundreds, into the thousands, of pages, I'm sure.
 "Q: Based on your review of the entire file and the bills, do you have a judgment as to whether or not the work performed by [the law firm] was necessary and reasonable? "A: I do.
"Q: And what is that opinion?
"A: It was.
 "Q: Do you have an opinion as to the amount of fees that were charged, were they necessary and reasonable?
 "A: It is my review of the time sheets that through the date of foreclosure, [the law firm] had submitted invoices to Beal Bank of $157,633.79. I myself did the mathematics. That is not a number supplied to me. I am informed through testimony here today and through the checks and all, that the fee was paid by Beal Bank, and that that is a reasonable fee for the work that I saw that corresponds to those time sheets.
". . . .
 "Q: You've heard several attorneys testify in the plaintiff's case here today?
"A: I did, and yesterday, yes, ma'am.
 "Q: And yesterday. That's correct. All of those attorneys agreed that the hourly rates were reasonable. Is that correct?
 "A: As I understood the testimony, I heard it that no one contested the hourly race [sic], and I would agree with that assessment. In fact, the rates are lower than my own rates and some of my partners of similar age and experience."
As opposed to Beal's witness, the witnesses testifying on Schilleci's behalf rendered their opinions based on piecemeal information. Some reviewed the billing logs, but were testifying only about the reasonableness of the fee charged in one facet of the proceedings. Others, who did not review the billing logs but rather a packet of information supplied by Schilleci, testified only generally that the total amount of the attorney fee charged was unreasonable. Only two witnesses made any reference to specific amounts of time they found to be unreasonable; the other witnesses spoke only generally. Yet all of the witnesses testified that the hourly rates charged were reasonable, keeping intact the presumption of reasonableness in that regard.
Having reviewed the record thus presented to us, given the wide numerical range presented by the testimony of the witnesses, we are not able to discern how the trial judge arrived at the lesser attorney fee of $80,000, which can only represent a rejection of certain hours claimed by the attorneys for Beal. We can understand his ruling only to mean that he identified certain activities and services billed by the law firm that were unreasonable in length or as staffed. As was the case inEdwards, 591 So.2d at 493, "[w]e are not in a position to determine if in fact the trial court abused its discretion in awarding a lesser fee than was requested without first knowing the court's reasons for doing so." Without some explanations by the trial judge as to what he discounted, we cannot determine whether he exceeded his discretion in awarding a lesser fee. Therefore, we remand this cause to the trial court for the entry of an explanatory order articulating the decision it made, and its reason for that decision, which resulted in the reduction of the attorney fee to $80,000. Due return shall be *Page 410 
made to this Court within 42 days of the date of this opinion.
REMANDED WITH DIRECTIONS.
HOUSTON, SEE, BROWN, and STUART, JJ., concur.
 On Return to Remand
HARWOOD, Justice.
On April 23, 2004, this Court remanded this cause to the trial court "for the entry of an explanatory order articulating the decision it made, and its reason for that decision, which resulted in the reduction of the attorney fee to $80,000." 896 So.2d at 409. Although, quoting Lanier v. Moore-Handley, Inc.,575 So.2d 83, 85 (Ala. 1991), we recognized that "`the reasonableness of an award of attorney fees is within the discretion of the trial court, subject to correction only for an abuse of discretion,'" 896 So.2d at 404, we also quoted City ofBirmingham v. Horn, 810 So.2d 667, 682 (Ala. 2001), for the proposition that "`the trial court's order regarding an attorney fee must allow for meaningful review by articulating the decisions made, the reasons supporting those decisions, and the performance of the attorney-fee calculation.'" We also acknowledged, however, the reiteration in several of our cases of the proposition that a trial judge might call to his or her aid the judge's own estimate of the value of the legal services in question, after considering the various elements otherwise established by the caselaw. 896 So.2d at 404.
On August 16, 2004, on remand the trial judge entered an 11-page "explanatory order," reciting in detail the various considerations, determinations, and calculations that had led to his excluding as unnecessary, unreasonable, redundant, and/or undescribed charges totaling $66,021 from the total attorney fee claimed of $146,021.
The order complies with our directive on remand, in that we are able to discern from the record what factors the trial court considered in determining the proper attorney fees to award. Reviewing the trial court's order explaining its considerations, determinations, and reasoning with the strong presumption in favor of the order, as explained in our original opinion, we cannot say that the trial court exceeded it discretion in the matter.
Accordingly, the trial court's order of December 19, 2002, as supplemented by its judgment of January 24, 2003, its order of May 6, 2003, and its order of August 16, 2004, on remand is due to be, and the same hereby is, affirmed.
AFFIRMED.
HOUSTON, SEE, BROWN, and STUART, JJ., concur.
[1] The declaratory-judgment action that is the basis of this appeal was filed in November 1999. The original litigation between these parties was filed in January 1998.