Rel: December 1, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2023-2024

————————————————

### SC-2023-0058

————————————————

### Eli Global, LLC, and Greg Lindberg

### v.

### Ronald Cieutat; Todd Vereen; Deborah Simison, as personal representative of the Estate of David Glenn Finnegan, deceased; Floyd Slay, Jr.; Timothy Andrews; Tyla Fowlkes; Mark Bier and Shawn Bier, as personal representatives of the Estate of Debra Little, deceased; Thomas Williams; Erin Bailey Kelso; Jan Wheeler; Eugene Dreher IV; Nancy Dreher; Joseph Moose; Phillip Epstein; Michael Dandurand; William McFarland; Angela Clark; Carol Jean Moorhead; and Michael Rudge

### Appeal from Mobile Circuit Court
### (CV-20-900993)

MENDHEIM, Justice.

Eli Global, LLC, and Greg Lindberg appeal, challenging a summary judgment entered against them by the Mobile Circuit Court in an action commenced by Ronald Cieutat, Todd Vereen, and multiple other plaintiffs involving Eli Global's alleged failure to fulfill its obligations on a promissory note and Lindberg's alleged failure to fulfill his obligations on a guaranty of that promissory note. Eli Global and Lindberg also challenge the circuit court's award of attorney fees and expenses to the plaintiffs. We affirm the circuit court's summary judgment, but we remand the case to the circuit court for it to enter an order articulating its reasons for the award of attorney fees and expenses.

## I. Facts

In 2002, Cieutat and Vereen founded Hemophilia Preferred Care, Inc., a company focused on treating individuals with hemophilia. The company eventually expanded its business via several affiliated entities to include patients with conditions such as Crohn's disease, hepatitis C, multiple sclerosis, rheumatoid arthritis, and other specialized conditions. The flagship entity became HPC, LLC ("HPC"), and its affiliated entities were: Hemophilia Preferred Care of Memphis, Inc.; HPC Biologicals, Inc.;

HPCNC, Inc.; HPC Specialty Rx West Virginia, Inc.; HPC Speciality Rx of Kansas, Inc.; Hemophilia Preferred Care of Oklahoma, Inc.; HPC Specialty Rx Reed, Inc.; and Hemophilia Preferred Care of Mississippi, Inc. Cieutat and Vereen served as the chief officers of those entities, and together they owned a majority stake in HPC and its affiliated entities, but 21 other individuals held smaller shares of HPC and its affiliated entities (Cieutat, Vereen, and the other owners are collectively referred to as "the Sellers").

In mid-2017, Eli Global agent Michael Pereira approached Cieutat, who was serving as chief executive officer ("CEO") of HPC and its affiliated entities, about Eli Global's interest in purchasing HPC and its affiliated entities.[1] On November 16, 2017, Eli Global formed Specialty Pharmacy Investments, LLC, which later changed its name to HPCSP Investments, LLC ("HPCSP"), for the express purpose of acquiring HPC and its affiliated entities.

---

[1]In an affidavit submitted by Pereira in this litigation, Pereira explained that "Eli Global, LLC, [is] the trade name for a group of affiliated companies operating in various industries throughout the United States and other countries."

On January 19, 2018, HPCSP entered into an "Equity Purchase Agreement" with the Sellers in which HPCSP agreed to purchase a 100% interest in HPC and its affiliated entities. The Equity Purchase Agreement designated Cieutat as the "Sellers' Representative" for the transaction, provided that the "Sellers' Representative shall have the power and authority to receive from [HPCSP] any and all amounts payable by [HPCSP] to Sellers under this Agreement, the Sellers' Note and the Equity Equivalence Agreement,[2] on behalf of Sellers," and stated that the "Sellers' Representative agrees ... to allocate and distribute such payments to Sellers in such amounts, at such times and on such terms as may be separately agreed by Sellers and Sellers' Representative." One of the "Conditions to Closing" provided in the Equity Purchase Agreement was: "Sellers' Representative shall have received a promissory note issued by Eli Global, LLC, in an aggregate original principal amount of $12,200,000, in substantially the form of,

---

[2]The parties do not discuss the Equity Equivalence Agreement in their briefs. By its terms, the Equity Equivalence Agreement gave the Sellers "certain contingent, deferred consideration in return (and as an additional inducement) for the Sellers' agreement to sell the Acquired Shares (as defined in the [Equity] Purchase Agreement), which additional consideration will be determined based on the [new] Company's future financial performance in accordance therewith."

and having the terms set forth on, Exhibit D (the 'Sellers Note'), duly executed by Eli Global, LLC." Indeed, the Equity Purchase Agreement defined the "Purchase Price" for the transaction to be "the Closing Payment, plus the Equity Equivalence Agreement Payments, plus the Sellers' Note." The Equity Purchase Agreement provided that it was to be "governed by, construed and enforced in accordance with the laws of the State of New York without giving effect to the principles of conflict of laws."

As part of the acquisition of HPC and its affiliated entities, HPCSP also executed on January 19, 2018, an "Executive Employment Agreement" with Cieutat to retain Cieutat as CEO of HPCSP for an initial term of five years.

The sale of HPC and its affiliated entities closed on April 13, 2018. It is undisputed that, on that date, Eli Global executed a "Promissory Note" in the amount of $12,200,000 that Cieutat received as the Sellers' representative on behalf of all the Sellers. Because the terms of the Promissory Note are integral to the arguments in this appeal, we set out here the key provisions of the Promissory Note:

> "For value received, the undersigned, Eli Global, LLC, a Delaware limited liability company ('Maker'), hereby

5

promises to pay to the order of Ron Cieutat (on behalf of Sellers (as defined below)), as Sellers' Representative ('Payee'), at such place, or to such other party, as the legal holder of this Promissory Note may from time to time designate in writing, in lawful currency of the United States of America, the principal sum of Twelve Million Two Hundred Thousand Dollars ($12,200,000), together with interest upon the principal amount at the rate of 4.0% per annum, in immediately available funds. The principal balance of this Promissory Note and all accrued interest thereon will be payable as set forth below. This Promissory Note is being issued pursuant to Section 9.2(c) of that certain Stock Purchase Agreement, dated as of January 19, 2018 (the '[Equity] Purchase Agreement'), by and among [Cieutat], as Sellers' Representative, HPCSP Investments, LLC, a North Carolina limited liability company, as buyer ('Buyer'), and the individuals party thereto as sellers ('Sellers'). Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Purchase Agreement.

"1. <u>Payments; Maturity Date</u>. [Eli Global] will repay this Promissory Note in five (5) equal annual installments of principal in the amount of $2,440,000 each, plus all accrued interest to the date of each such payment, with such payments due and payable on the first five anniversaries of the date hereof (such final payment date, the 'Maturity Date'). If not sooner repaid, the principal amount of this Promissory Note and all accrued interest thereon will be due and payable in full on the Maturity Date. All payments of principal and interest and any other charges due hereunder shall be payable to [Eli Global] through any recognized means designated by [Cieutat, as the Sellers' representative,] including, without limitation, electronic transfer, wire transfer and/or debit. [Eli Global] agrees that the obligations to make the payments set forth in this paragraph are guaranteed pursuant to the Guaranty attached hereto as Exhibit A.

"….

"5. <u>Right of Offset</u>. In accordance with Section 11.10 of the [Equity] Purchase Agreement, [Eli Global] is authorized, at any time and from time to time, to the fullest extent permitted by Law, to set-off and apply any and all amounts payable by [Eli Global] to [Cieutat, as the Sellers' representative,] under this Promissory Note against any amounts payable by [Cieutat, as the Sellers' representative,] to [HPCSP] under Article XI of the [Equity] Purchase Agreement or otherwise. In the event of such offset, [Eli Global] will provide notice to [Cieutat, as the Sellers' representative,] of such setoff amount and promptly deliver a replacement Promissory Note reflecting the new principal amount owed thereunder to [Cieutat, as the Sellers' representative]. [Cieutat, as the Sellers' representative,] agrees, in exchange for such replacement Promissory Note and upon receipt thereof, to return this Promissory Note to [Eli Global] for cancellation.

"6. <u>Default</u>. A default under this Promissory Note will exist if any of the following occurs (each an 'Event of Default'):

"(a) If [Eli Global] fails to perform any obligation or covenant under this Promissory Note and such failure continues for at least fifteen (15) business days after the date on which [Eli Global] has been given notice of such failure to perform ….

"….

"7. <u>Acceleration</u>. Upon any Event of Default under this Promissory Note, the entire principal sum hereof may, at the sole option of [Cieutat, as the Sellers' representative], be declared at once due and payable, without demand or notice, the same being expressly waived, time being of the essence of this obligation …. [Eli Global] shall pay all reasonable and actual costs and expenses incurred by [Cieutat, as the Sellers'

7

representative,] in connection with collecting or attempting to collect any sums due under this Promissory Note or enforcing any provision of this Promissory Note, including but not limited to reasonable attorneys' fees and disbursements and applicable statutory costs, whether incurred out of court or in litigation, including pre-trial, appellate and bankruptcy proceedings.

"8. No Waiver; Remedies Cumulative. The failure of [Cieutat, as the Sellers' representative,] or [Eli Global] to exercise any right or remedy provided hereunder or available at law shall not be a waiver or release of such rights or remedies or the right to exercise any right or remedy at another time. The remedies provided [Cieutat, as the Sellers' representative,] in this Promissory Note and the [Equity] Purchase Agreement shall be cumulative and concurrent, and shall be in addition to every other right or remedy now or hereafter provided by law or equity. Such remedies may be pursued singly, successively or together against [Eli Global], any guarantor of this Promissory Note, or any other security for this Promissory Note at the option of [Cieutat, as the Sellers' representative]. [Eli Global] hereby expressly waives any right to make a claim for or relating to the marshaling of assets. The failure to exercise or delay in exercising any such remedy shall not be construed as a waiver or release thereof.

"....

"13. Governing Law. This Promissory Note shall be governed by, construed and enforced in accordance with the laws of the State of New York without giving effect to the principles of conflict of laws."

It is also undisputed that on the same date, April 13, 2018, and pursuant to the terms of the Promissory Note, Lindberg executed a "Guaranty" of payment on the Promissory Note. Because the terms of the

8

Guaranty are also integral to the arguments in this appeal, we set out here the provisions of the Guaranty:

> "This Guaranty ('Guaranty'), dated as of April 13, 2018, is made by Greg Lindberg ('Guarantor') in favor and for the benefit of Ron Cieutat (on behalf of Sellers), as Sellers' Representative ('Payee').

> "Reference is made to that certain Promissory Note, in an aggregate original principal amount of $12,200,000, issued by Eli Global, LLC, a Delaware limited liability company ('Maker'), to [Cieutat, as the Sellers' representative,] on the date hereof (the 'Promissory Note').

> "By his signature below [Lindberg] hereby irrevocably and unconditionally guaranties for the benefit of [Cieutat, as the Sellers' representative], as primary obligor and not merely as surety, the due and punctual payment in full of all obligations owing by [Eli Global] under the Promissory Note when the same shall become due, whether at stated maturity, by required prepayment or otherwise (collectively, the 'Guarantied Obligations').

> "This Guaranty is a continuing guaranty and shall remain in effect until all of the Guarantied Obligations shall have been paid in full. This Guaranty is a guaranty of payment when due and not of collectability. [Cieutat, as the Sellers' representative,] may enforce this Guaranty upon the occurrence of a failure by [Eli Global] to pay any of the payments due pursuant to the Promissory Note.

> "This Guaranty is not intended, and will not be construed, to create any rights in any parties other than [Cieutat, as the Sellers' representative,] and no other person may assert any rights as third-party beneficiary hereunder.

"This Guaranty shall be governed by, construed and enforced in accordance with the laws of the State of New York without giving effect to the principles of conflict of laws."

It is undisputed that in April 2019 Eli Global made its first of the five installment payments pursuant to the terms of the Promissory Note to Cieutat, as the Sellers' representative,[3] but that Eli Global failed to make its 2020 installment payment even after Cieutat, on behalf of the Sellers, sent Eli Global and Lindberg a written notice of default. Eli Global likewise has not made any subsequent installment payments. It is undisputed that Lindberg made no payments pursuant to the Guaranty.

On October 15, 2019, Cieutat's employment as CEO of HPCSP was terminated by HPCSP portfolio manager Michael Pereira. In a termination letter Pereira sent to Cieutat, Pereira stated that Cieutat was being fired for cause based on an allegedly severe decline in the company's financial health and because of Pereira's determination that Cieutat had "engaged in discriminatory conduct based on gender,

---

[3]Eli Global did not make its first installment payment in a timely manner, but it cured the default within 15 days of being notified of its failure to make the payment.

including but not limited to, gender discrimination, pregnancy discrimination, and pay discrimination."

On May 6, 2020, Cieutat, Vereen, and the other 21 Sellers filed a complaint in the Mobile Circuit Court against Eli Global and Lindberg.[4] The Sellers asserted a claim of breach of contract against Eli Global for its failure to make payments pursuant to the Promissory Note. The Sellers asserted a claim against Lindberg for breach of the Guaranty.[5] Cieutat, on behalf of the Sellers, attached signed and executed copies of the Promissory Note and the Guaranty to the complaint.

On July 27, 2020, Eli Global filed an answer to the complaint and counterclaims against Cieutat. Eli Global's counterclaims against

_____

[4]On February 18, 2020, the Sellers filed a separate lawsuit against HPCSP and Lindberg in the Mobile Circuit Court alleging that HPCSP and Lindberg had failed to properly allocate the purchase price in tax filings as required by the Equity Equivalence Agreement, resulting in higher tax liability on the Sellers. HPCSP subsequently removed that case to the United States District Court for the Southern District of Alabama, but it was later remanded to the Mobile Circuit Court.

[5]During the course of the litigation below, two of the Sellers died, and the personal representatives of their estates were substituted as plaintiffs, and four of the Sellers voluntarily dismissed their claims against Eli Global and Lindberg at certain points in the litigation, thus leaving only the individuals identified as appellees in the style of this case.

Cieutat alleged fraud, intentional/negligent misrepresentation, and unjust enrichment. Eli Global alleged that Cieutat had failed to disclose during the negotiations to purchase HPC and its affiliated entities that Cieutat had engaged in employment discrimination as CEO of HPC, behavior that substantially reduced the value of the company. On September 4, 2020, Lindberg filed an answer to the complaint and counterclaims against Cieutat, which were almost identical to Eli Global's answer and counterclaims.

On October 5, 2020, Cieutat filed a motion to dismiss the counterclaims asserted against him by Eli Global and Lindberg. In that motion, Cieutat asserted, among other things, that,

> "[s]hortly before the first installment payment was due [on the Promissory Note], Mr. Lindberg was indicted based on evidence that he attempted to bribe the North Carolina Insurance Commissioner. … Strapped for cash, Eli Global terminated Mr. Cieutat under the guise that he had been engaging in unidentified discriminatory conduct.
>
> "[Eli Global and Lindberg] failed to make the second installment payment under [the] Promissory Note in April 2020. A federal jury found Mr. Lindberg guilty of bribery in May 2020, and he was sentenced to seven years in prison."

On November 19, 2020, Eli Global and Lindberg filed a response in opposition to Cieutat's motion to dismiss their counterclaims. On

December 8, 2020, the circuit court denied Cieutat's motion to dismiss, but the circuit court treated the motion as a motion for a more definite statement with respect to the counterclaims alleging fraud, which the circuit court granted. On January 22, 2021, Eli Global and Lindberg filed an amended counterclaim against Cieutat in which they offered more detailed allegations of fact concerning Cieutat's alleged discriminatory conduct. On February 1, 2021, Cieutat filed an answer to Eli Global and Lindberg's amended counterclaim.[6]

On December 6, 2019, Cieutat commenced a lawsuit in Mobile Circuit Court against Eli Global, HPCSP, and Pereira asserting claims of breach of contract, fraudulent inducement, and intentional interference with contractual relations ("the employment lawsuit"). On January 19, 2021, Cieutat, Eli Global, HPCSP, and Pereira executed a "Settlement Agreement and Mutual Release" that precipitated a dismissal of the employment lawsuit. A portion of the settlement agreement contained a mutual release of parties and claims to the extent described therein. In pertinent part, that portion of the settlement agreement provided:

"C. MUTUAL RELEASE OF PARTIES

---

[6]On December 22, 2021, Cieutat filed an amended answer to Eli Global and Lindberg's amended counterclaim.

"For and in consideration of the obligations and agreements set forth herein, consideration which the Parties[7] acknowledge is sufficient, the Parties hereby agree to the following:

"Except as expressly outlined in Section C(vi) and C(vii), the Parties hereby irrevocably and unconditionally release and forever discharge each other and their representatives, attorneys, affiliates, officers, directors, successors, heirs and assigns ('Released Parties') with respect to any and all claims and causes of action of any nature whatsoever, both past and present, known and unknown, foreseen and unforeseen, at law or in equity, which were or could have been asserted by the Parties or on behalf of the Parties by any person, government authority, or entity, arising in connection with, resulting from, or relating in any way to the Lawsuit, or relating, directly or indirectly, to Cieutat's employment with Employer Parties,[8] and any affiliates. …

"….

"vi. Anything contained in this Agreement to the contrary notwithstanding, the terms of Section C shall not apply to any claims or defenses brought in the following lawsuits currently on file:

"(i) Ronald Cieutat et al. v. HPCSP Investments, LLC and Greg E. Lindberg, in the Circuit Court of Mobile County, Alabama, Case No. 02-CV-2020-900422.00; and

---

[7]The "Parties" are defined earlier in the settlement agreement to be HPCSP, Eli Global, Pereira, and Cieutat.

[8]The "Employer Parties" are defined earlier in the settlement agreement to be HPCSP, Eli Global, and Pereira.

14

"(ii) Ronald Cieutat et al. v. Eli Global, LLC and Greg E. Lindberg, in the Circuit Court of Mobile County, Alabama, Case No. CV-2020-900993.00.

"vii. Anything contained in this Agreement to the contrary notwithstanding, the terms of this Section C shall not apply to any claims Cieutat, the Employer Parties, or others have or may have in the future with respect to any of the following:

"(i) The Equity Purchase Agreement executed January 19, 2018;

"(ii) The Equity Equivalence Agreement executed on our about April 13, 2018; and

"(iii) The Promissory Note executed on or about April 13, 2018.

"Except as expressly outlined in Section C(vi) and C(vii), it is understood and agreed that the release set forth herein is intended as and shall be deemed to be a full and complete release of any and all claims that the Parties may have arising out of Cieutat's employment with Employer Parties and/or the Employment Agreement, arising on or before the date of execution of this Agreement, and said release is intended to cover and does cover any and all causes of action thereof and arising out of or in connection with any occurrence arising on or before the Effective Date of this Agreement."

On December 22, 2021, the Sellers filed a summary-judgment motion and a brief and exhibits in support thereof. On August 11, 2022,

15

the Sellers supplemented their summary-judgment motion. In their supplement, the Sellers attempted to refute Eli Global and Lindberg's allegations asserting that the reason Eli Global refused to make further payments on the Promissory Note was because Eli Global had been fraudulently induced to execute the Promissory Note without being informed of Cieutat's alleged discrimination against women employed by HPC. The Sellers argued that Eli Global had defaulted on the Promissory Note because of financial difficulties with the loan it had obtained to help finance the purchase of HPC and its affiliated entities. The Sellers also alleged that Eli Global was "cash strapped and trying to fund the criminal defense of Lindberg from approximately March 2019 until the fall of 2019."

On August 23, 2022, Eli Global and Lindberg filed a response in opposition to the Sellers' summary-judgment motion along with exhibits in support thereof. In their opposition, Eli Global and Lindberg continued to assert that "Cieutat had a long-standing history of discriminating against women and women with children, abusing employees by cursing at and threatening them, and conducting his business by instilling fear and intimidating others," but that such behavior had been concealed from

16

Eli Global and Lindberg until after the sale of HPC and its affiliated entities. They argued that

"had [Eli Global and Lindberg] known they were purchasing a company with such corrupt leadership they would not have agreed to execute the Promissory Note and Guaranty or would not have agreed to the amount set forth in the Note. [Eli Global and Lindberg] did not pay for the company they were led to believe they were getting and were forced to re-structure and overhaul the company as a result of Cieutat's damaging behavior. Consequently, [Eli Global and Lindberg] were justified in any alleged non-payment and a fact issue as to that justification remains."

On August 24, 2022, the Sellers filed their reply to Eli Global and Lindberg's opposition to the summary-judgment motion along with several exhibits in support thereof.

On September 21, 2022, the circuit court entered its initial order addressing the Sellers' summary-judgment motion. In that order, the circuit court entered a summary judgment in favor of the Sellers

"on the claims asserted by [the Sellers] and all counterclaims asserted against [Cieutat].

"Judgment is hereby entered in favor of [the Sellers] in the principal amount of $9,760,000.00 plus interest of $1,450,989.60 through September 21, 2022. Additional interest per diem of $1,626.67 shall accrue beginning September 22, 2022, until the judgment is satisfied.

"[The Sellers] have thirty (30) days from the date of this Order to submit an affidavit and fee bills setting forth their

17

> request for attorneys' fees, expenses, and costs. [Eli Global and Lindberg] have 14 days to object, following which date, the Court will enter judgment for reasonable attorneys' fees, expenses, and costs."

(Footnote omitted.)

On October 5, 2022, the Sellers submitted a "Motion to Enter Attorneys' Fees and Costs Award." In that motion, the Sellers noted that the Promissory Note contained a provision requiring Eli Global to pay attorney fees and expenses incurred by the Sellers in connection with attempting to collect sums due under the Promissory Note. They explained that Cieutat and Vereen had split attorney fees and expenses in this case, that two law firms and a separate attorney had been engaged for the case, and that the total amount of attorney fees was $208,491.75, and the total amount of expenses was $15,853.38. The Sellers attached affidavits from Cieutat, Vereen, and one of their attorneys, Jennifer S. Holifield, in support of their motion. Holifield testified in her affidavit to the hourly rate charged by herself, by the other attorney in her firm who worked on the case, and by her firm's paralegals. Holifield stated that she had reviewed the invoices from the other attorneys for the Sellers and that their "rates are standard for the areas in which they were charged, and were fair and reasonable for the work that was performed."

She also testified that she was familiar with and had considered the factors to be considered when determining the appropriate amount of an award of attorney fees, which were set forth in Peebles v. Miley, 439 So. 2d 137 (Ala. 1983). After listing those factors, Holifield stated: "[I]t is my professional opinion that the attorneys' fee and expenses of $224,345.13 charged to [the Sellers] in this matter is fair, standard and reasonable, was necessary, and is due to be awarded against [Eli Global and Lindberg], jointly and severally, under the promissory note and guaranty." The Sellers also submitted slightly redacted copies of a large number of invoices from their attorneys that documented charged fees and expenses.

On October 7, 2022, the circuit court entered an order awarding the Sellers $224,345.13 in attorney fees and expenses to be paid by Eli Global and Lindberg "jointly and severally." On October 11, 2022, the circuit court set aside its October 7, 2022, order, and it gave Eli Global and Lindberg until October 20, 2022, to file an objection to the Sellers' motion for payment of attorney fees and expenses.

Shortly thereafter, Eli Global and Lindberg obtained new counsel to represent them in this case. On October 20, 2022, Eli Global and

19

Lindberg filed their "Opposition and Objections to Plaintiffs' Motion to Enter Attorneys' Fees and Costs Award." In that opposition, Eli Global and Lindberg argued that the requested attorney fees and expenses were "unreasonable and unsupported." Specifically, they contended that some fees were redundant, that internal law-firm billing records were insufficient to demonstrate the actual cost of incurred expenses, and that some of the attorney fees and expenses were for "unsuccessful motions or motions necessitated by [the Sellers'] own conduct," such as when the Sellers switched law firms during the litigation.

On October 21, 2022, Eli Global and Lindberg filed a Rule 59(e), Ala. R. Civ. P., postjudgment motion requesting that the circuit court alter, amend, or vacate the summary judgment entered for the Sellers. In that motion, for the first time, Eli Global and Lindberg contended that the summary judgment should be vacated because the Promissory Note was a negotiable instrument under New York's version of the Uniform Commercial Code ("the New York UCC") and the Sellers never presented "any evidence that they are (or any of them is) the owner and holder of the negotiable instrument underlying their note and guaranty claims." Because of that alleged lack of evidence, Eli Global and Lindberg insisted,

20

the summary judgment should be vacated. Eli Global and Lindberg also argued, for the first time, that Cieutat had released Lindberg from any liability on the Guaranty in the settlement agreement executed in the employment lawsuit. Finally, the postjudgment motion contended that the circuit court's summary-judgment order was unclear as to whether the judgment amount was due to be paid only to Cieutat on behalf of all the Sellers or whether "each existing [Seller] is entitled to judgment against Eli Global and Lindberg in the specified amounts."

On December 13, 2022, the Sellers filed a response to Eli Global and Lindberg's postjudgment motion. In their response, the Sellers first noted that Eli Global and Lindberg's main arguments were entirely new. They further contended that the Promissory Note was not a negotiable instrument under the New York UCC; that, even if it was, there was never any dispute that Cieutat held the Promissory Note; that such an objection was an affirmative defense that Eli Global and Lindberg never pleaded; and that Cieutat never released Lindberg from his obligation under the Guaranty.

Also on December 13, 2022, the Sellers filed a reply to Eli Global and Lindberg's opposition to the Sellers' motion for payment of attorney

fees and expenses. The Sellers responded to each of the arguments from Eli Global and Lindberg in detail. In particular, the Sellers discussed the applicability of the <u>Peebles</u> factors at length. Additionally, the Sellers submitted along with their reply a second affidavit from attorney Holifield in which she provided further explanation for why she believed the fee award was reasonable. Eli Global and Lindberg responded by submitting an affidavit from one of their attorneys, Abigail R.S. Campbell, asserting that Eli Global and Lindberg's production of discovery was appropriate and that all requested depositions were necessary.

On December 21, 2022, the circuit court entered an order it titled "Final Judgment." Because the details of that order are integral to arguments in this appeal, we set out the substance of the December 21, 2022, order here:[9]

> "The Court on December 14, 2022, heard [the Sellers'] Motion to Enter Attorneys' Fees and Costs Award; [Eli Global and Lindberg's] Opposition and Objections to [the Sellers'] Motion to Enter Attorneys' Fees and Costs Award; [the Sellers'] Reply to [Eli Global and Lindberg's] Opposition and Objections to [the Sellers'] Motion to Enter Attorneys' Fees and Costs Award; <u>[Eli Global and Lindberg's] Rule 59(e) Motion to Alter, Amend, or Vacate Judgment</u>; and [the

---

[9]The circuit court's record citations are omitted.

Sellers'] Objection to [Eli Global and Lindberg's] Rule 59(e) Motion to Alter, Amend, or Vacate Judgment. The court considered the above motions, responses, replies, materials submitted; the pleadings on file; and counsel's arguments and concludes as follows:

"1. The Court's prior order on [the Sellers'] Motion for Summary Judgment should be amended to clarify that the judgment awards Ronald Cieutat in his representative capacity only a single judgment amount (for the purposes of collecting the judgment), instead of awarding each [Seller] an independent judgment against Eli Global, LLC and Greg Lindberg; however, nothing herein shall be construed as removing or altering each [Seller's] right as between themselves to their share of the judgment;

"2. [The Sellers'] motion to enter attorneys' fees and costs award is granted; and

"3. Except as stated in the preceding paragraph number one, [Eli Global and Lindberg's] Rule 59(e) Motion to Alter, Amend, or Vacate Judgment is denied.

"Accordingly, judgment is hereby entered in favor of Ronald Cieutat in his representative capacity on behalf of all of [the Sellers], jointly and severally against Defendants Eli Global, LLC d/b/a Global Growth and Greg Lindberg, (a) in the principal amount of $9,760,000.00 plus interest of $1,450,989.60 through September 21, 2022, and additional interest per diem of $1,626.67 beginning on September 22, 2022, until the judgment is satisfied; (b)(i) $61,330.00 in attorneys' fees and $4,446.96 in expenses with the Baker Donelson firm, (ii) $17,575.00 in attorneys' fees with Bob Clute, and (iii) $138,211.75 in attorneys' fees and $11,406.42 in expenses with the Speegle Hoffman firm; and (c) all of which shall accrue post-judgment interest at the highest lawful rate.

"This is a final and appealable judgment, and all other relief not expressly granted in this judgment is denied."

Eli Global and Lindberg appeal from the circuit court's December 21, 2022, order.

## II. Standard of Review

"This Court's review of a summary judgment is de novo. Williams v. State Farm Mut. Auto. Ins. Co., 886 So. 2d 72, 74 (Ala. 2003). We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So. 2d 949, 952-53 (Ala. 2004). In making such a determination, we must review the evidence in the light most favorable to the nonmovant. Wilson v. Brown, 496 So. 2d 756, 758 (Ala. 1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce 'substantial evidence' as to the existence of a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So. 2d 794, 797-98 (Ala. 1989); Ala. Code 1975, § 12-21-12. '[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' West v. Founders Life Assur. Co. of Fla., 547 So. 2d 870, 871 (Ala. 1989)."

Dow v. Alabama Democratic Party, 897 So. 2d 1035, 1038-39 (Ala. 2004).

"'"The determination of whether an attorney fee is reasonable is within the sound discretion of the trial court and its determination on such an issue will not be disturbed on appeal unless in awarding the fee the trial court exceeded that

24

discretion. State Bd. of Educ. v. Waldrop, 840 So. 2d 893, 896 (Ala. 2002); City of Birmingham v. Horn, 810 So. 2d 667, 681-82 (Ala. 2001); Ex parte Edwards, 601 So. 2d 82, 85 (Ala. 1992), citing Varner v. Century Fin. Co., 738 F.2d 1143 (11th Cir. 1984)."'"

Regions Bank v. Lowrey, 154 So. 3d 101, 108 (Ala. 2014) (quoting Kiker v. Probate Court of Mobile Cnty., 67 So. 3d 865, 867 (Ala. 2010), quoting in turn Pharmacia Corp. v. McGowan, 915 So. 2d 549, 552 (Ala. 2004)).

## III. Analysis

Eli Global and Lindberg seek a reversal of the summary judgment entered against them, and they challenge the amount of the award of attorney fees and expenses. We will examine those arguments in separate parts of our analysis.

## A. The Circuit Court's Summary Judgment in Favor of the Sellers

Eli Global and Lindberg's sole argument for reversal of the summary judgment entered against them is the one they presented in their postjudgment motion: they contend that the Promissory Note is a negotiable instrument under the New York UCC and that the Sellers never presented conclusive evidence that Cieutat -- or any other Seller -- possessed the Promissory Note at the time the Sellers initiated this action. Eli Global and Lindberg assert that the foregoing failure of proof

25

dooms the Sellers' claim seeking payment on the Promissory Note because the New York UCC requires such proof in order for a claimant to enforce a negotiable promissory note. They further argue that because the Sellers' promissory-note claim fails, Lindberg owes no duty to pay them under the Guaranty.

The Sellers' first objection to the foregoing argument is that Eli Global and Lindberg never presented it in response to the Sellers' summary-judgment motion. Indeed, Eli Global and Lindberg never raised an issue concerning possession of the Promissory Note in their answers to the complaint, and throughout the lengthy discovery -- interrogatories to each Seller and depositions of all the Sellers -- Eli Global and Lindberg never once inquired about who possessed the Promissory Note. The first time any issue was raised concerning possession of the Promissory Note was in Eli Global and Lindberg's postjudgment motion. Therefore, the Sellers argue, Eli Global and Lindberg waived that argument.

Eli Global and Lindberg respond by noting that the circuit court had discretion to consider new arguments presented in the postjudgment motion.

> "'"[A] trial court has the discretion to consider a new legal argument in a post-judgment motion, but is not required to do so."' Special Assets, L.L.C. v. Chase Home Fin., L.L.C., 991 So. 2d 668, 678 (Ala. 2007) (quoting Green Tree Acceptance, Inc. v. Blalock, 525 So. 2d 1366, 1369 (Ala. 1988))."

Espinoza v. Rudolph, 46 So. 3d 403, 416 (Ala. 2010). Eli Global and Lindberg further assert that the circuit court's December 21, 2022, order demonstrates that the circuit court did consider, but rejected on the merits, their new arguments presented in their postjudgment motion. For support, Eli Global and Lindberg cite the opening paragraph of the circuit court's December 21, 2022, order, in which the circuit court stated, in part: "The Court on December 14, 2022, heard … [Eli Global and Lindberg's] Rule 59(e) Motion to Alter, Amend, or Vacate Judgment …. The court considered the above motions, responses, replies, materials submitted; the pleadings on file; and counsel's arguments and concludes as follows: …."

The foregoing statement from the circuit court's December 21, 2022, order certainly indicates that the circuit court "considered" the new arguments Eli Global and Lindberg presented in their postjudgment motion, but it does not tell us whether the circuit court considered the merits of those arguments as opposed to rejecting them because they

27

were not raised earlier in the litigation. See <u>Espinoza</u>, 46 So. 3d at 416 (concluding that "[t]here is no indication that the trial court considered the merits of the legal argument raised for the first time in Jabez's postjudgment motion, and we will not presume that it did"). We are dubious of Eli Global and Lindberg's extremely belated assertion of arguments based on the New York UCC. However, because the circuit court may have considered the merits of Eli Global and Lindberg's new postjudgment arguments, we will address them on the merits.

<u>1. Is the Promissory Note a Negotiable Instrument?</u>

New York law applies with respect to the Promissory Note because the Promissory Note contains a choice-of-law provision that states as much. As we have already noted, Eli Global and Lindberg argue that the Sellers failed to prove who was the holder/possessor of the Promissory Note, a fact that, they say, is a requirement under the New York UCC for a claimant to be able to enforce a negotiable instrument. See Eli Global & Lindberg's brief, p. 15.

Under New York law, "[a] 'promissory note [is] a negotiable instrument within the meaning of the Uniform Commercial Code' (<u>Mortgage Elec. Registration Sys., Inc. v Coakley</u>, 41 AD3d 674, 674[, 838

28

N.Y.S.2d 622] [2007]; <u>see</u> UCC 3-104[2][d]; <u>US Bank, N.A. v Zwisler</u>, 147 AD3d 804, 806[, 46 N.Y.S.3d 213] [2017]." <u>Bayview Loan Servicing, LLC v Kelly</u>, 166 AD3d 843, 845, 87 N.Y.S.3d 569, 571 (2018). According to the New York UCC:

> "(1) Any writing to be a negotiable instrument within this Article must
>
> > "(a) be signed by the maker or drawer; and
> >
> > "(b) contain an unconditional promise or order to pay a sum certain in money and no other promise, order, obligation or power given by the maker or drawer except as authorized by this Article; and
> >
> > "(c) be payable on demand or at a definite time; and
> >
> > "(d) be payable to order or to bearer."[10]

N.Y. U.C.C. Law § 3-104.

---

[10]N.Y. U.C.C. Law § 3-111 provides, in part:

> "An instrument is payable to bearer when by its terms it is payable to
>
> > "....
> >
> > "(b) a specified person or bearer ...."

Eli Global and Lindberg contend that the Promissory Note "is a negotiable instrument because it is made 'payable to the order of' a payee -- Cieutat as the Sellers' representative -- and its payment obligation -- the amount due and payment date -- is discernable on its face." Eli Global & Lindberg's brief, pp. 15-16. There is no dispute that the Promissory Note was signed by Eli Global, that it was payable at a definite time, and that it was payable to Cieutat, as the Sellers' representative. The Sellers argue, however, that the Promissory Note was not an "unconditional promise" under the New York UCC because it was subject to, or dependent upon, the Equity Purchase Agreement.

The Sellers observe that the opening paragraph of the Promissory Note states, in part:

> "This Promissory Note is being issued pursuant to Section 9.2(c) of that certain Stock Purchase Agreement, dated as of January 19, 2018 (the '[Equity] Purchase Agreement'), by and among [Cieutat], as Sellers' Representative, HPCSP Investments, LLC, a North Carolina limited liability company, as buyer ('Buyer'), and the individuals party thereto as sellers ('Sellers')."

Section 9.2(c) of the Equity Purchase Agreement states:

"ARTICLE IX

"Conditions to Closing

30

"….

"9.2. <u>Conditions to the Obligations of Sellers</u>. The obligations of Sellers to consummate the transactions contemplated by this Agreement are further subject to the satisfaction or the waiver by [Cieutat, as the Sellers' representative,] at or prior to the Closing of each of the following conditions:

"….

"(c)  <u>Sellers' Note</u>.  [Cieutat,  as  the  Sellers' representative,] shall have received a promissory note issued by Eli Global, LLC, in an aggregate original principal amount of $12,200,000, in substantially the form of, and having the terms set forth on, Exhibit D (the 'Sellers Note'), duly executed by Eli Global, LLC."

In other words, the Promissory Note declared that it was being issued because delivery of the executed Promissory Note to Cieutat, as the Sellers' representative, was a condition of closing the sale of HPC and its affiliated entities.

The Sellers also point to paragraph 5 of the Promissory Note, which states:

"5. <u>Right of Offset</u>. In accordance with Section 11.10 of the [Equity] Purchase Agreement, [Eli Global] is authorized, at any time and from time to time, to the fullest extent permitted by Law, to set-off and apply any and all amounts payable by [Eli Global] to [Cieutat, as the Sellers' representative,] under this Promissory Note against any amounts payable by [Cieutat, as the Sellers' representative,] to [HPCSP] under Article XI of the [Equity] Purchase

31

Agreement or otherwise. In the event of such offset, [Eli Global] will provide notice to [Cieutat, as the Sellers' representative,] of such setoff amount and promptly deliver a replacement Promissory Note reflecting the new principal amount owed thereunder to [Cieutat, as the Sellers' representative]. [Cieutat, as the Sellers' representative,] agrees, in exchange for such replacement Promissory Note and upon receipt thereof, to return this Promissory Note to [Eli Global] for cancellation."

Section 11.10 of the Equity Purchase Agreement states:

"ARTICLE XI

"Survival and Indemnification

"….

"11.10. Set-Off. Sellers hereby acknowledge and agree that [HPCSP] is authorized, at any time and from time to time, to the fullest extent permitted by Law, to set-off and apply any and all amounts payable by [HPCSP] to any Seller or Sellers' Representative (on behalf of Sellers) (including amounts outstanding under the Sellers' Note or any amounts payable to any Seller pursuant to the Equity Equivalence Agreement or under Article VII[11]) against any amounts

---

[11]Article VII of the Equity Purchase Agreement concerns the payment of taxes on the sale. Section 7.11 states:

"7.11. Right of Offset. Without limiting their respective rights under this Article VII in any respect, (a) Sellers' Representative (on behalf of Sellers) may (but shall not be obligated to) offset amounts owed by [HPCSP] to Sellers' Representative (on behalf of Sellers) under this Article VII against amounts otherwise payable by Sellers' Representative (on behalf of Sellers) to [HPCSP] under this Article VII and (b) [HPCSP] may (but shall not be obligated to) offset amounts

payable by any Seller or by Sellers' Representative (on behalf of Sellers) to [HPCSP] under this Article XI, under Article VII or otherwise upon providing at least 10 days' prior written notice."

(Emphasis added.) The Sellers contend that the foregoing references in the Promissory Note to the Equity Purchase Agreement demonstrate that the Promissory Note is not an unconditional promise to pay and that, therefore, it is not a negotiable instrument under the New York UCC.

Eli Global and Lindberg counter by arguing that the Promissory Note's references to the Equity Purchase Agreement are "informational," rather than "conditional," and therefore do not render the Promissory Note nonnegotiable. Eli Global & Lindberg's reply brief, p. 6. For support, Eli Global and Lindberg cite N.Y. U.C.C. Law § 3-105 and its Official Comment. In pertinent part, § 3-105 provides:

"(1) A promise or order otherwise unconditional is not made conditional by the fact that the instrument

"....

---

owed by Sellers' Representative (on behalf of Sellers) to [HPCSP] under this Article VII in accordance with Section 11.10. The Parties agree that the exercise of such right of offset will not constitute a breach of a covenant under this Agreement, and that neither the exercise of nor the failure to exercise such right of offset will constitute an election of remedies or limit a Party in any manner in the enforcement of any other remedies that may be available to it."

"(b) states its consideration, whether performed or promised, or the transaction which gave rise to the instrument, or that the promise or order is made or the instrument matures in accordance with or 'as per' such transaction; or

"(c) refers to or states that it arises out of a separate agreement or refers to a separate agreement for rights as to prepayment or acceleration; or

"….

"(2) A promise or order is not unconditional if the instrument

"(a) states that it is subject to or governed by any other agreement; or

"(b) states that it is to be paid only out of a particular fund or source except as provided in this section."

The relevant portions of the Official Comment to § 3-105 explain:

"2. Paragraph (b) of subsection (1) is an amplification of Section 3(2) of the original act. The final clause is intended to resolve a conflict in the decisions over the effect of such language as 'This note is given for payment as per contract for the purchase of goods of even date, maturity being in conformity with the terms of such contract.' It adopts the general commercial understanding that such language is intended as a mere recital of the origin of the instrument and a reference to the transaction for information, but is not meant to condition payment according to the terms of any other agreement.

34

"3. Paragraph (c) of subsection (1) likewise is intended to resolve a conflict, and to reject cases in which a reference to a separate agreement was held to mean that payment of the instrument must be limited in accordance with the terms of the agreement, and hence was conditioned by it. Such a reference normally is inserted for the purpose of making a record or giving information to anyone who may be interested, and in the absence of any express statement to that effect is not intended to limit the terms of payment. Inasmuch as rights as to prepayment or acceleration has to do with a 'speed-up' in payment and since notes frequently refer to separate agreements for a statement of these rights, such reference does not destroy negotiability even though it has mild aspects of incorporation by reference. …

"….

"8. Paragraph (a) of subsection (2) retains the generally accepted rule that where an instrument contains such language as 'subject to terms of contract between maker and payee of this date,' its payment is conditioned according to the terms of the agreement and the instrument is not negotiable. The distinction is between a mere recital of the existence of the separate agreement or a reference to it for information, which under paragraph (c) of subsection (1) will not affect negotiability, and any language which, fairly construed, requires the holder to look to the other agreement for the terms of payment. The intent of the provision is that an instrument is not negotiable unless the holder can ascertain all of its essential terms from its face. In the specific instance of rights as to prepayment or acceleration, however, there may be a reference to a separate agreement without destroying negotiability [As amended 1962]."

(Emphasis added.)

35

Eli Global and Lindberg contend that the reference in the first paragraph of the Promissory Note to the Equity Purchase Agreement is exactly the kind of reference the Official Comment to § 3-105 states is "a reference to the transaction for information, but is not meant to condition payment according to the terms of any other agreement." We agree. The reference to the Equity Purchase Agreement in the first paragraph of the Promissory Note simply observes that the execution of the Promissory Note was one of the conditions of the sale closing.

However, Eli Global and Lindberg also insist that "there are no conditions to payment not stated in the note and a payee need not look elsewhere to discern the payment terms." Eli Global & Lindberg's reply brief, p. 7. That position is difficult to square with paragraph five of the Promissory Note concerning the right of set off, which is determined by references to the Equity Purchase Agreement. The sections of the Equity Purchase Agreement implicated by paragraph 5 of the Promissory Note indicate that Eli Global could be entitled to reductions in the amounts it owed under the Promissory Note due to taxes or indemnification paid in accordance with the Equity Purchase Agreement and the Equity Equivalence Agreement. Eli Global and Lindberg assert that those

provisions merely refer to "possible early discharge of the note in whole or in part without suggesting an external payment condition let alone one that would extend payment beyond the payment dates." Eli Global & Lindberg's reply brief, p. 7. But the reality is that paragraph five of the Promissory Note makes payments under the Promissory Note potentially contingent upon factors provided in the Equity Purchase Agreement.

Moreover, on a broader level, the fact is that the Promissory Note is a part of the Equity Purchase Agreement. In addition to the fact that a required condition of closing the sale was Eli Global's providing the Promissory Note to the Sellers, Article I of the Equity Purchase Agreement defines the "Transaction Documents" as including "this Agreement, the Equity Equivalence Agreement, the Employment Agreements and the Sellers' Note …." Paragraph 12.2 of the Equity Purchase Agreement also states:

> "12.2 Entire Agreement. This Agreement (including the Schedules and Exhibits hereto) and other Transaction Documents constitute the entire agreement among the Parties and supersede any prior understandings or agreements by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof and thereof."

37

(Emphasis added.) The Promissory Note was an exhibit to the Equity Purchase Agreement. Additionally, paragraph eight of the Promissory Note provides that "[t]he remedies provided [Cieutat, as the Sellers' representative,] in this Promissory Note and the [Equity] Purchase Agreement shall be cumulative and concurrent ...." (Emphasis added.) Finally, Eli Global and Lindberg themselves argued in their response to the Sellers' summary-judgment motion that that the Promissory Note was part of the Equity Purchase Agreement. That argument was integral to their original (but abandoned on appeal) defense to the Sellers' claims:

> "[Eli Global and Lindberg] clearly assert that they relied on information Cieutat provided to Eli Global in negotiating the terms of and executing the Guaranty Agreement, Promissory Note and overall transaction.
>
> "Cieutat's duty to disclose or to correct misinformation does not arise as part of the [Equity Purchase Agreement] alone. Rather, because [Eli Global and Lindberg] requested information from Cieutat and relied on information from him in taking an action -- i.e. executing the Promissory Note and Guaranty -- he had a duty to not mislead [Eli Global and Lindberg]."

(Citations omitted.) In short, because the Promissory Note was part of a larger transaction, all of its essential terms were not contained therein, meaning that the Promissory Note was not a negotiable instrument. Because the Promissory Note was not negotiable, the Sellers were not

38

required to prove who possessed the Promissory Note in order to enforce it.

### 2. Possession of the Promissory Note

Even if the Promissory Note could be construed as a negotiable instrument, we believe Eli Global and Lindberg's argument that the Sellers failed to prove who possessed the Promissory Note also fails. Eli Global and Lindberg initially contend that the Sellers "had to conclusively prove that they -- as holders of the note -- possessed the note when they sued and filed their summary judgment motion." Eli Global & Lindberg's brief, p. 15. To support that proposition, Eli Global and Lindberg cite <u>Aurora Loan Servicing, LLC v. Taylor</u>, 25 N.Y.3d 355, 34 N.E.3d 363, 12 N.Y.S.3d 612 (2015). But Eli Global and Lindberg misconstrue <u>Taylor</u>.

The <u>Taylor</u> court explained that Aurora Loan Servicing, LLC ("Aurora"), had filed a foreclosure action against the Taylors.

> "<u>The Taylors filed a motion for summary judgment, asserting that Aurora did not have standing to bring this foreclosure action</u>. Aurora cross-moved for summary judgment. In support of its cross motion, Aurora submitted the affidavit of Sara Holland (Holland affidavit), Aurora's legal liaison, who stated that based on her 'personal knowledge' of the facts as well as her 'review of the note, mortgage and other loan documents' and 'related business

records ... kept in the ordinary course of the regularly conducted business activity,' the 'original Note has been in the custody of Plaintiff Aurora Loan Services, LLC and in its present condition since May 20, 2010.' Holland also stated that, 'prior to the commencement of the action, Aurora Loan Services, LLC, has been in exclusive possession of the original note and allonge affixed thereto, indorsed to Deutsche Bank Trust Company Americas as Trustee, and has not transferred same to any other person or entity.' A copy of the note and allonge were attached to the affidavit.

"....

"The critical issue we must resolve is whether the record demonstrates a basis for finding that Aurora had standing to commence this mortgage foreclosure action. The physical delivery of the note to the plaintiff from its owner prior to commencement of a foreclosure action may, in certain circumstances, be sufficient to transfer the mortgage obligation and create standing to foreclose ....

"Applying these principles of New York law, Aurora was vested with standing to foreclose. The evidence established that, as of 2006, Deutsche, as trustee under the PSA, became the lawful owner of the note. The Holland affidavit establishes that Aurora came into possession of the note on May 20, 2010, prior to the May 24, 2010 commencement of the foreclosure action. ...

"Contrary to the Taylors' assertions, to have standing, it is not necessary to have possession of the mortgage at the time the action is commenced. This conclusion follows from the fact that the note, and not the mortgage, is the dispositive instrument that conveys standing to foreclose under New York law. In the current case, the note was transferred to Aurora before the commencement of the foreclosure action -- that is what matters."

40

Taylor, 25 N.Y.3d 355, 359-61, 34 N.E.3d at 365-66, 12 N.Y.S.2d at 614-15 (emphasis added).

From the foregoing, it is clear that Taylor does not stand for the proposition that, to file their summary-judgment motion, the Sellers had to conclusively prove that a particular one of them possessed the Promissory Note. Instead, Taylor noted that when the Taylors, the defendants, raised the issue of Aurora's "standing" to bring a foreclosure action, Aurora had to provide prima facie evidence that it possessed the note before commencing the foreclosure action.[12] Taylor's explanation aligns with several other New York cases, which state that once the defendant in a foreclosure action has raised the issue of the plaintiff's "standing" to foreclose, the plaintiff must provide prima facie evidence of possession of the note in question. Moreover, those cases also state that a lack of such "standing" initially must be pleaded as an affirmative defense, or the defense is waived and cannot be raised in response to a

_____

[12]We note that the cases Eli Global and Lindberg cite for the proposition that the Sellers needed to demonstrate that one of them had physical possession of the note are, unlike this case, mortgage-foreclosure cases. It is unclear whether the rule in those cases applies to the type of promissory note at issue here, but, as we explain in the text, even under such cases Eli Global and Lindberg's argument fails.

plaintiff's summary-judgment motion. See, e.g., <u>Bayview Loan Servicing, LLC v. Freyer</u>, 192 A.D.3d 1421, 1422-23, 145 N.Y.S.3d 647, 649 (2021) (explaining that "'[w]here, as here, the issue of standing is raised as an affirmative defense, the plaintiff must also prove its standing in order to be entitled to relief' (<u>Deutsche Bank Natl. Trust Co. v Monica</u>, 131 AD3d 737, 738[, 15 N.Y.S.3d 863] [2015] [internal quotation marks and citations omitted] …. A 'plaintiff has standing in a mortgage foreclosure action where it is both the holder or assignee of the subject mortgage and the holder or assignee of the underlying note at the time the action is commenced' (<u>Citibank, N.A. v Abrams</u>, 144 AD3d 1212, 1214[, 40 N.Y.S.3d 653] [2016] [internal quotation marks and citations omitted]; <u>see</u> <u>JPMorgan Chase Bank, N.A. v Verderose</u>, 154 AD3d 1198, 1200[, 63 N.Y.S.3d 579] [2017]). 'Holder status is established where the plaintiff possesses a note that, on its face or by allonge, contains an indorsement in blank or bears a special indorsement payable to the order of the plaintiff' (<u>McCormack v Maloney</u>, 160 AD3d 1098, 1099[, 75 N.Y.S.3d 294] [2018] [internal quotation marks and citations omitted]."); <u>JPMorgan Chase Bank, Nat'l Ass'n v. Caliguri</u>, 36 N.Y.3d 953, 954, 160 N.E.3d 693, 694, 136 N.Y.S.3d 225, 226 (2020) (same); <u>Wells Fargo Bank,</u>

NA v. Ostiguy, 127 A.D.3d 1375, 1376, 8 N.Y.S.3d 669, 670-71 (2015)

(same).[13]

_____

[13]In a concurrence in US Bank N.A. v. Nelson, 36 N.Y.3d 998, 163 N.E.3d 49, 139 N.Y.S.3d 118 (2020), Justice Rowan Wilson disagreed with the approach taken by New York courts on this issue, stating:

"The law governing [whether the plaintiff is the current holder of the defendant's note] is not our jurisprudence on standing but rather the law of negotiable instruments, codified in New York's Uniform Commercial Code. …

"….

"In the past decade, New York courts have firmly adopted the mistaken use of the word 'standing' to refer to questions about whether the plaintiff in a foreclosure action holds the defendant's note. The consequence of that mislabeling has caused many courts to hold that the note's obligor (the homeowner, typically) must plead 'lack of standing' as an affirmative defense …."

36 N.Y.3d at 1007-09, 163 N.E.3d at 55-56, 139 N.Y.S.3d at 124-25. Even so, Justice Wilson still believed that all that was required of the plaintiff in that case was to present the note with the summary-judgment motion. See Nelson, 36 N.Y.3d at 1012, 163 N.E.3d at 58, 139 N.Y.S.3d at 127 ("When US Bank moved for summary judgment, it attached the Nelsons' note, indorsed in blank, the mortgage, and the assignment of the mortgage. Doing so established, prima facie, US Bank's right to judgment as a matter of law. To defeat US Bank's motion for summary judgment, the Nelsons were required to adduce admissible facts controverting US Bank's proof of ownership …. That they utterly failed even to attempt to do. US Bank, therefore, was entitled to summary judgment."). In this case, the Sellers fulfilled that requirement because Cieutat, on behalf of the Sellers, attached a signed and executed copy of the Promissory Note to the complaint.

Based on the foregoing New York case authorities -- including Eli Global and Lindberg's own cited authority, <u>Taylor</u> -- Eli Global and Lindberg waived in two ways the issue whether the Sellers possessed the Promissory Note at the time they commenced this action. First, it is undisputed that Eli Global and Lindberg never asserted a lack of "standing" as an affirmative defense in their answers to the Sellers' complaint. Second, Eli Global and Lindberg did not raise the issue of possession in response to the Sellers' summary-judgment motion.

In response to the problem that they never raised the possession issue -- either in their answers or in response to the Sellers' summary-judgment motion -- Eli Global and Lindberg retreat from their initial assertion that the Sellers' had to conclusively prove possession and, instead, posit that the propositions from the foregoing cases do not apply because in those cases "each plaintiff presented a prima facie case." Eli Global & Lindberg's reply brief, p. 15. In contrast, they say, the Sellers

> "never presented a prima facie case because they did not plead or prove who among them, if any of them, possessed the note. That is, [the Sellers] never put possession at issue in the first instance .... Because [the Sellers] did not present a prima facie case, [Eli Global and Lindberg] were not required to assert lack of standing as an affirmative defense."

<u>Id.</u> at 16.

44

We note that in making the foregoing argument, Eli Global and Lindberg have subtly lowered the Sellers' alleged burden of proof on summary judgment from needing "conclusive proof" of possession to requiring "prima facie" proof, which suggests that their initial argument misstated the law. However, Eli Global and Lindberg's updated argument continues to misstate what New York authorities say. The cases repeatedly state that possession of a negotiable promissory note only becomes an issue if that issue is challenged by the defendant. Eli Global and Lindberg did not raise the possession issue in a timely manner, and they consequently waived the issue.

In any event, Eli Global and Lindberg admitted in their answers to the complaint and in their amended counterclaim that Cieutat, as the Sellers' representative, entered into the Equity Purchase Agreement with HPCSP, that Eli Global executed the Promissory Note in conjunction with the Equity Purchase Agreement, that the Promissory Note was part of the Equity Purchase Agreement, and that Cieutat received and possessed the Promissory Note. They also admitted that Eli Global made the first payment under the Promissory Note to Cieutat in his capacity as the Sellers' representative. Specifically, in their

45

"Amended Counterclaim against Ron Cieutat" filed on January 22, 2021,

Eli Global and Lindberg stated:

> "10. The sale of HPC to HPCSP closed on or about April 13, 2018, and, under the terms of the [Equity Purchase Agreement], Cieutat, on behalf of the Sellers of HPC, received a promissory note issued by Eli Global for the amount of $12,200,000 to be paid out over five (5) years in equal installments of $2,440,000 each, plus interest ('Promissory Note'). As further part of the sale, Lindberg signed a Guaranty Agreement personally guaranteeing the Promissory note.
>
> "....
>
> "22. In or about April 2019, in accordance with the Promissory Note, Eli Global made a payment of $2,440,000 to the HPC sellers, which included Cieutat."

Eli Global and Lindberg insist that those admissions are

meaningless.

> "Whether Cieutat received the note in April 2018 does not prove that he still possessed it over two years later when [the Sellers] sued.
>
> "....
>
> "That Cieutat received the first payment is not surprising since he is the [the Sellers'] representative. But that does not mean he personally possessed the note. Somebody had to receive the payment and distribute the funds, including to the note possessor."

Eli Global & Lindberg's reply brief, p. 13 (footnote omitted).

46

However, Cieutat, on behalf of the Sellers, submitted an executed copy of the Promissory Note as an exhibit to their complaint, and Eli Global and Lindberg never denied the legitimacy of the presented Promissory Note. In fact, in their answers to the complaint, both Eli Global and Lindberg repeatedly stated that "the Promissory Note speaks for itself."

> "A plaintiff may establish, prima facie, its standing as the holder of the note by demonstrating that a copy of the note, properly endorsed 'either to bearer or to an identified person that is the person in possession' (UCC 1-201[b][21][A]; see [UCC] 3-301), either on the note itself, 'or on a paper so firmly affixed thereto as to become a part thereof' (UCC 3-202[2]), was among the exhibits annexed to the complaint at the time the action was commenced …."

HSBC Bank USA, N.A. v. Carchi, 177 A.D.3d 710, 712, 111 N.Y.S.3d 679, 682 (2019).

Additionally, New York U.C.C. Law § 1-201(21)(A) defines a "holder" as "the person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession." The Promissory Note itself states that Cieutat is the holder of the note whom Eli Global would pay:

> "For value received, the undersigned, Eli Global, LLC, a Delaware limited liability company ('Maker'), hereby promises to pay to the order of Ron Cieutat (on behalf of

47

> Sellers (as defined below)), as Sellers' Representative ('Payee'), at such place, or to such other party, <u>as the legal holder of this Promissory Note</u> … the principal sum of Twelve Million Two Hundred Thousand Dollars ($12,200,000), together with interest upon the principal amount at the rate of 4.0% per annum, in immediately available funds."

(Emphasis added.)

Cieutat's submission of the Promissory Note with the complaint, Eli Global's first payment on the note to him, and Eli Global and Lindberg's admissions constituted more than sufficient prima facie evidence that Cieutat possessed the Promissory Note when the Sellers commenced this action. See, e.g., <u>Jin Sheng He v. Sing Huei Chang</u>, 83 A.D.3d 788, 789, 921 N.Y.S.2d 128, 130 (2011) ("To establish prima facie entitlement to judgment as a matter of law with respect to a promissory note, a plaintiff must show the existence of a promissory note executed by the defendant containing an unequivocal and unconditional obligation to repay and the failure of the defendant to pay in accordance with the note's terms …."); <u>Griffon V, LLC v. 11 E. 36th, LLC</u>, 90 A.D.3d 705, 707, 934 N.Y.S.2d 472, 474 (2011) (same). Eli Global and Lindberg fail to cite any evidence in the record suggesting that Cieutat ever transferred or lost possession of the Promissory Note. Therefore, even if the Promissory Note was negotiable, and even if Eli Global and Lindberg had not waived

the possession issue, the fact of possession was sufficiently established for the Sellers' summary-judgment motion. Accordingly, Eli Global and Lindberg failed to demonstrate that the Sellers lacked the right to enforce payment on the Promissory Note.

### 3. Did Cieutat Release His Claims Against Lindberg?

Aside from the argument seeking to escape liability to all the Sellers for payment under the Promissory Note, Lindberg contends that he should not have to pay the amount of the judgment that is owed to Cieutat because, he says, Cieutat released his guaranty claim against Lindberg in the settlement agreement executed in the employment lawsuit. As we recounted in the rendition of facts, the settlement agreement in the employment lawsuit arose from an action commenced by Cieutat against HPCSP, Eli Global, and Eli Global representative Michael Pereira, and those parties executed the settlement agreement. In Part C of that settlement agreement, the parties agreed to

> "irrevocably and unconditionally release and forever discharge each other and their representatives, attorneys, affiliates, officers, directors, successors, heirs and assigns ('Released Parties') with respect to any and all claims and causes of action of any nature whatsoever … resulting from, or relating in any way to the Lawsuit, or relating, directly or indirectly, to Cieutat's employment with Employer Parties, and any affiliates. …"

49

Lindberg contends that he is a representative of the released parties because he signed the Equity Purchase Agreement as HPCSP's manager and signed the Promissory Note as Eli Global's manager.

However, Part C also contained express carveouts from the generally broad release. We repeat the carveouts for the benefit of this analysis:

> "vi. Anything contained in this Agreement to the contrary notwithstanding, the terms of Section C shall not apply to any claims or defenses brought in the following lawsuits currently on file:
>
> > "(i) Ronald Cieutat et al. v. HPCSP Investments, LLC and Greg E. Lindberg, in the Circuit Court of Mobile County, Alabama, Case No. 02-CV-2020-900422.00; and
> >
> > "(ii) Ronald Cieutat et al. v. Eli Global, LLC and Greg E. Lindberg, in the Circuit Court of Mobile County, Alabama, Case No. CV-2020-900993.00.
>
> "vii. Anything contained in this Agreement to the contrary notwithstanding, the terms of this Section C shall not apply to any claims Cieutat, the Employer Parties, or others have or may have in the future with respect to any of the following:
>
> > "(i) The Equity Purchase Agreement executed January 19, 2018;

"(ii) The Equity Equivalence Agreement executed on our about April 13, 2018; and

"(iii) The Promissory Note executed on or about April 13, 2018."

Lindberg contends that although section C.vii(iii) expressly exempted Cieutat's claims with respect to the Promissory Note,

"it did not mention Lindberg's guaranty. Stated differently, by including the note without mentioning the guaranty, the parties excluded the guaranty from the exceptions to the release. The parties could have written § C(vii) to exclude both the Promissory Note executed on or about April 13, 2018, and Lindberg's Guaranty had they agreed to expand the release carve out in that manner. But they did not do that. Instead, they limited Cieutat's release carve out to only his claims/rights vis-à-vis the note and left the release intact as to Lindberg's guaranty."

Eli Global & Lindberg's brief, pp. 21-22 (emphasis in original; footnotes omitted).

Lindberg's argument entirely ignores the language in section C.vi of the settlement agreement, which expressly exempts from release "any claims or defenses brought in" this very case.[14] That carveout obviously

---

[14]Lindberg's neglect of the language in section C.vi of the settlement agreement on appeal is curious given that he highlighted that language in the response to the summary-judgment motion:

"The Settlement Agreement executed by the Employment Litigation parties specifically carved out claims

51

implicates Cieutat's claims against Lindberg with respect to the Guaranty <u>in this case</u>. As the Sellers note, "[t]hese two carve-outs are separately numbered exceptions to the Release. In fact, the two carve-outs are referred to conjunctively and cumulatively throughout the Release." Sellers' brief, p. 27. Thus, there is no reason to read section C.vii as somehow deliberately releasing Lindberg from claims Cieutat already had asserted against Lindberg in the present litigation. In short, Cieutat's claims against Lindberg based on the Guaranty were not released in the settlement agreement, and Lindberg's suggestion otherwise is meritless.

<u>B. The Circuit Court's Award of Attorney Fees and Expenses to the Sellers</u>

As we noted in our rendition of the facts, paragraph seven of the Promissory Note expressly provides:

> "[Eli Global] shall pay all reasonable and actual costs and expenses incurred by [Cieutat, as the Sellers' representative,] in connection with collecting or attempting to collect any sums

---

> or defenses brought in this litigation (the 'Note Litigation') as well as any claims 'Cieutat, the Employer Parties, or others have or may have in the future with respect to' the [Equity Purchase Agreement], the Equity Equivalence Agreement, and the Promissory Note."

(Footnote omitted.)

due under this Promissory Note or enforcing any provision of this Promissory Note, including but not limited to reasonable attorneys' fees and disbursements and applicable statutory costs, whether incurred out of court or in litigation ...."

In Pharmacia Corp. v. McGowan, 915 So. 2d 549, 552-53 (Ala. 2004), this Court stated:

> "This Court has set forth 12 criteria a court might consider when determining the reasonableness of an attorney fee:
>
>> "'(1) [T]he nature and value of the subject matter of the employment; (2) the learning, skill, and labor requisite to its proper discharge; (3) the time consumed; (4) the professional experience and reputation of the attorney; (5) the weight of his responsibilities; (6) the measure of success achieved; (7) the reasonable expenses incurred; (8) whether a fee is fixed or contingent; (9) the nature and length of a professional relationship; (10) the fee customarily charged in the locality for similar legal services; (11) the likelihood that a particular employment may preclude other employment; and (12) the time limitations imposed by the client or by the circumstances.'
>
> "Van Schaack v. AmSouth Bank, N.A., 530 So. 2d 740, 749 (Ala. 1988). These criteria are for purposes of evaluating whether an attorney fee is reasonable; they are not an exhaustive list of specific criteria that must all be met. Beal Bank v. Schilleci, 896 So. 2d 395, 403 (Ala. 2004), citing Graddick v. First Farmers & Merchants Nat'l Bank of Troy, 453 So. 2d 1305, 1311 (Ala. 1984).
>
> "We defer to the trial court in an attorney-fee case because we recognize that the trial court, which has presided

over the entire litigation, has a superior understanding of the factual questions that must be resolved in an attorney-fee determination. [City of Birmingham v. ]Horn, 810 So. 2d [667,] 681-82 [(Ala. 2001)], citing Hensley v. Eckerhart, 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Nevertheless, a trial court's order regarding an attorney fee must allow for meaningful appellate review by articulating the decisions made, the reasons supporting those decisions, and how it calculated the attorney fee. Horn, 810 So. 2d at 682, citing American Civil Liberties Union of Georgia v. Barnes, 168 F.3d 423, 427 (11th Cir. 1999); see also Hensley, 461 U.S. at 437, 103 S.Ct. 1933."[15]

---

[15]The Sellers and Eli Global and Lindberg apply Alabama law in arguing about whether the circuit court's award of attorney fees and expenses was appropriate. They do not address whether the Promissory Note's choice-of-law clause has any bearing on the circuit court's evaluation of the reasonableness of an award of attorney fees and expenses. The answer to such a question would depend upon whether a claim for contractual attorney fees is substantive or procedural in nature because, in an action based on a contract with a choice-of-law provision, substantive matters are governed by the law of the chosen jurisdiction -- New York in this instance -- but matters of procedure are governed by the law of the forum. See, e.g., Etheredge v. Genie Indus., Inc., 632 So. 2d 1324, 1326 (Ala. 1994) ("'[A] court will apply foreign law only to the extent that it deals with the substance of the case, i.e., affects the outcome of the litigation, but will rely on forum law to deal with the "procedural" aspects of the litigation.'" (quoting Eugene F. Scoles & Peter Hay, Conflict of Laws 57 (1992))). However, this Court has not addressed whether a claim for contractual attorney fees is substantive or procedural in nature, and reviews by other courts reveal that this is not a settled issue in other jurisdictions. See, e.g., 1600 Barberry Lane 8 LLC v. Cottonwood Residential O.P. LP, 493 P.3d 580, 586-87 (Utah 2021); Boswell v. RFD-TV the Theater, LLC, 498 S.W.3d 550, 557-60 (Tenn. Ct. App. 2016). Because the parties do not ask us to address that question and because they agree that Alabama law applies to the issue of the reasonableness of the attorney-fee award, we will apply Alabama law.

54

Eli Global and Lindberg contend that the Sellers failed to prove that the circuit court's awarded attorney fees and expenses are recoverable because, instead of addressing the foregoing 12 factors that were first enunciated in  Peebles v. Miley, 439 So. 2d 137, 140-41 (Ala. 1983), they say that the Sellers only presented "conclusory testimony that [the] fee [was] based on the hours spent and the results achieved." Eli Global & Lindberg's brief, p. 24.

We reject Eli Global and Lindberg's contention that the Sellers did not provide adequate explanations or evidentiary support for their request for attorney fees and expenses. As we recounted in our rendition of the facts, the Sellers submitted multiple affidavits -- including two affidavits from one of their current attorneys -- a large number of invoices detailing their attorneys' fees and expenses, and arguments that discussed the Peebles factors in detail. When viewed as a whole, the Sellers' submissions were more than adequate to allow the circuit court to determine whether the Sellers' requested attorney fees and expenses were reasonable.

However, Eli Global and Lindberg also contend that the circuit court's order awarding attorney fees and expenses did not "provide for

55

meaningful appellate review by articulating the decision made, the reasons supporting that decision, and how it calculated the attorneys' fees." Eli Global & Lindberg's brief, p. 28; see Pharmacia, 915 So. 2d at 553. The Sellers do not really dispute that contention, arguing instead that the circuit court's order "was supported by facts and analysis" that they submitted. Sellers' brief, p. 33. Although, as we already have stated, we agree that the Sellers submitted sufficient facts and analysis in support of their requested award, that is not the standard we have applied to a circuit court's order awarding attorney fees and expenses. See, e.g., Kiker v. Probate Ct. of Mobile Cnty., 67 So. 3d 865, 868 (Ala. 2010) ("In this case, the probate court's December 22, 2009, order awarding attorney fees and expenses … provides no indication as to whether the probate court considered the criteria set forth for determining the reasonableness of an attorney fee as detailed in Pharmacia, 915 So. 2d at 552-53 …. Additionally, the probate court's order neither indicates how the probate court calculated the attorney fees nor provides a basis for ascertaining the exact amount of [the] award specifically attributable to attorney fees. Although the probate court stated in its original order of November 24, 2009, that its decision was

based on the 'evidence and argument presented,' the probate court provides no detailed application of the facts regarding the attorney fees to the factors detailed in Pharmacia."); Madison Cnty. Dep't of Hum. Res. v. T.S., 53 So. 3d 38, 44 (Ala. 2009) ("In this case, the trial court's order approving an attorney fee … plus litigation expenses … provides no indication as to whether the trial court considered the criteria set forth for determining the reasonableness of an attorney fee as detailed in Pharmacia, nor does it indicate how the trial court calculated the attorney fee. Although the trial court states that its decision is based on the evidence, it provides no detailed application of the facts regarding Fees's fee to the factors set forth in Pharmacia.").

Concerning attorney fees and expenses, the circuit court's December 21, 2022, order simply stated:

"2. [The Sellers'] motion to enter attorneys' fees and costs award is granted; and

"….

"Accordingly, judgment is hereby entered in favor of Ronald Cieutat in his representative capacity on behalf of all of [the Sellers], jointly and severally against Defendants Eli Global LLC d/b/a Global Growth and Greg Lindberg, … (b)(i) $61,330.00 in attorneys' fees and $4,446.96 in expenses with the Baker Donelson firm, (ii) $17,575.00 in attorneys' fees with Bob Clute, and (iii) $138,211.75 in attorneys' fees

and $11,406.42 in expenses with the Speegle Hoffman firm; and (c) all of which shall accrue post-judgment interest at the highest lawful rate."

The circuit court's order "does not expressly state that the circuit court considered each of the 12 factors set out in Pharmacia," but as we noted in Moultrie v. Wall, 143 So. 3d 128, 137 (Ala. 2013), that shortfall is not sufficient to find error with the award. Still, the order's threadbare nature does not "allow for meaningful appellate review by articulating the decisions made, the reasons supporting those decisions, and how it calculated the attorney fee." Pharmacia, 915 So. 2d at 553. Perhaps sensing that we might reach such a conclusion, the Sellers argue that "this Court is authorized to render judgments that it believes the trial court should have rendered" and, thus, "may enter a reasoned judgment in the [Sellers'] favor supporting the attorneys' fees and expenses award." Sellers' brief, p. 47. But as we observed in Pharmacia, "[w]e defer to the trial court in an attorney-fee case because we recognize that the trial court, which has presided over the entire litigation, has a superior understanding of the factual questions that must be resolved in an attorney-fee determination." Pharmacia, 915 So. 2d at 553. Therefore, we conclude that the proper course of action is to remand this case to the

58

circuit court for the entry of an explanatory order articulating the decision it made, and its reason for that decision, which resulted in the attorney fees and expenses it awarded to the Sellers.[16] Cf. Kiker, 67 So. 3d at 870; Beal Bank, SSB v. Schilleci, 896 So. 2d 395, 409-10 (Ala. 2004).

## IV. Conclusion

The Promissory Note was not a negotiable instrument. Even if we construed it as such under the New York UCC, the Sellers were not required to prove who possessed the Promissory Note because Eli Global and Lindberg waived that argument in the circuit court. Even if Eli Global and Lindberg had not waived their possession argument, the Sellers presented a sufficient prima facie case to establish that Cieutat, as the Sellers' representative, possessed the Promissory Note, and Eli Global and Lindberg presented no evidence to refute his possession. Accordingly, the Sellers had the right to enforce payment on the

---

[16]

"We note that, when an appellate court remands a case, the trial court's authority is limited to compliance with the directions provided by the appellate court; it does not have the authority to reopen for additional testimony except where expressly directed to do so. Madison Cty. Dept. of Human Res. v. T.S., 53 So. 3d 38 (Ala. 2009)."

Ex parte Shinaberry, 326 So. 3d 1037, 1043 n.3 (Ala. 2020).

Promissory Note, and Eli Global and Lindberg do not dispute the amount owed under the Promissory Note. Additionally, Cieutat did not release his claims against Lindberg that are based on the Guaranty. Therefore, we affirm the circuit court's judgment finding Eli Global and Lindberg liable based on the Promissory Note and the Guaranty, and we affirm its award of the principal amount plus interest due based on that liability. However, because the circuit court's December 21, 2022, order did not provide sufficient explanation as to how it determined the award of attorney fees and expenses, we remand the case for the circuit court to enter an order articulating its reasons for that portion of the order. Due return shall be made to this Court within 42 days of the date of this opinion.

AFFIRMED IN PART AND REMANDED WITH INSTRUCTIONS.

Parker, C.J., and Shaw, Wise, Bryan, Stewart, Mitchell, and Cook, JJ., concur.

Sellers, J., concurs in the result.